# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs November 6, 2012

## STATE OF TENNESSEE v. STEVEN DALE HILL

**Appeal from the Circuit Court for Maury County**
**No. 207040      Robert L. Jones, Judge**

___

**No. M2012-00982-CCA-R3-CD - Filed March 15, 2013**

___

Defendant was found guilty after a trial by jury of aggravated arson, a Class A felony, aggravated burglary, a Class C felony, theft of property over $1000.00, a Class D felony. He was sentenced to twenty years for aggravated arson, six years for aggravated burglary, and four years for theft over $1,000.00, with all sentences to run concurrently, for a total effective sentence of twenty years. On appeal, the defendant claims that the evidence is insufficient to support his convictions and that the trial court erred by failing to instruct the jury that one of the State's witnesses was an accomplice as a matter of law. Upon review, we determine that the evidence is sufficient to support the defendant's convictions and that the trial court properly instructed the jury with respect to the legal status of the State's witness. The judgments from the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH AND ALAN E. GLENN, JJ., joined.

Gary Howell, Mt. Pleasant, Tennessee, for the appellant, Steven Dale Hill.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Mike Bottoms, District Attorney General; and Kyle Dodd, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On April 7, 2011, the defendant was indicted on four counts: (1) Aggravated arson in violation of Tennessee Code Annotated section 39-14-302; (2) Aggravated Burglary in

violation of Tennessee Code Annotated section 39-14-403; (3) Reckless endangerment in violation of Tennessee Code Annotated section 39-13-103; and (4) theft of property worth $1000.00 or more but less than $10,000.00 in violation of Tennessee Code Annotated section 39-14-103. The defendant was tried on November 2-3, 2011. The reckless endangerment count was dismissed by the State immediately prior to trial.

The victim of the crime, Mr. Danny Bradley, testified that he lived in a three-bedroom house on New Highway 7 in Maury County. He testified that on the morning of January 31, 2011, he and the woman with whom he was living, Ms. Lisa Workman, shared some coffee before she left for work. Between 10:15 and 10:30 a.m., he also left the house in order to refill some prescriptions and pay some bills. Afterward, he had lunch with Ms. Workman in a park and then ran some additional errands before stopping at his mother's house. While he was there, he heard several sirens go by. At 3:05 p.m., he received a phone call from a friend informing him that his house was on fire. The victim testified that he left his mother's house and returned to his home as fast as he could. When he arrived, his house was surrounded by people and engulfed in flames. The victim testified that the firemen had a great deal of difficulty extinguishing the fire.

The victim further testified that he was a longtime knife collector who owned more than 150 knives. After the fire was extinguished, he toured his former residence to survey the damage. The victim testified that he discovered that the drawers of his bedroom dresser appeared to have been pulled out and thrown onto his bed. A set of his "President's knives" appeared to have been moved from their usual location and laid out in the bedroom. Numerous additional knives that he owned, including some collectible "Mule Day" knives, were missing. The victim estimated that the total value of his missing knives was between $1500 and $2000. In addition, The victim testified that "[a]ll of [his] medicine and stuff like that was gone." The missing medicines included muscle relaxers and Percocet.

While on the stand, the victim was shown an exhibit which he identified as an "Indian knife." He testified that the knife belonged to him and that he had last seen it approximately a month before his house burned down. He testified that to the best of his knowledge, the knife had been located in his house on the day of the fire, inside a wooden box which also contained his "Mule Day" knives. Before concluding, the victim testified that he had not given anyone permission to enter his house or set a fire on the day in question.

On cross-examination, the victim testified that he did not know the defendant, and that as far as he knew, the defendant had never been in his home prior to January 31, 2011. He testified that as far as he could tell, only certain items that had been located in his bedroom appeared to be out of place after the fire.

Mr. Michael Henderson, a fire investigator with the Maury County Fire Department, testified that he investigated the fire at issue. He testified that first responders were still actively fighting the fire when he arrived. He testified that he determined that the fire started in the master bedroom. He testified that he determined, based on some "shadowing" that appeared on a chest in the bedroom, that a set of knives had been removed and placed on top of it prior to the fire. He testified that he also determined during his investigation that all of the drawers from a chest of drawers had been removed prior to the fire, and what appeared to be a pile of clothing had been made at the foot of the bed. He testified that after making these determinations he secured the crime scene and coordinated further investigation with law enforcement.

On cross-examination, Mr. Henderson testified that the fire was initially reported by an individual named John F. Morton. He testified that Mr. Morton was driving by the victim's house when he saw smoke and decided to stop. Mr. Henderson testified that all of the doors to the victim's house were locked when Mr. Morton stopped to investigate. Mr. Henderson testified that Mr. Morton kicked open the front and side doors to the house, but he could not enter inside because there was too much smoke.

Ms. Lourie Corley testified that she was the defendant's girlfriend, and she was dating the defendant on January 31, 2011. She testified that on that day, Ms. Tammy Owens came over to visit the defendant, and together the three of them went to "the creek." Ms. Corley testified that the defendant and Ms. Owens left together at approximately 1:00 p.m. in Ms. Owens' van. She testified that she did not see the pair again until 11:00 a.m. the following day, when she saw them back at "the creek" in the same location.

On cross-examination, Ms. Corley testified that from time to time Ms. Owens would ask the defendant to help out with various chores, and the defendant would do so. Ms. Corley testified that the defendant knew how to perform some mechanic work, and on the day in question, Ms. Owens had requested the defendant's assistance with tuning up her van and with fixing one of its sliding doors. Ms. Corley testified that when the two left together, they did so ostensibly in order to get parts to fix Ms. Owen's van. Ms. Corley testified that during the time that the two were gone, she spoke with the defendant by telephone three or four times. The defendant made no mention of any fire during any of these conversations. Ms. Corley also testified that after the fire she never saw the defendant with any medication or knives that he had not owned previously.

Mr. Terry Owens testified that he was the brother of Ms. Tammy Owens. He testified that on the date in question he saw the defendant around 3:00 p.m., when the defendant arrived at his mother's house in the company of his sister. He testified that he told the defendant to leave, because men were not supposed to be at his mother's house when she was

not there. The defendant became belligerent in response. Mr. Owens testified that the defendant "threatened to burn [him] out" and made statements such as "I know where you live" and "I'll get you tonight." He testified that his sister and the defendant left together in his sister's van. He testified that the next time he saw his sister's van was two days later, when he saw it parked in the parking lot of a Baptist church. He eventually reported this fact to police.

Ms. Tanny Owens testified that the defendant was her "best friend" and "big brother." She testified that they had been friends with each other since she was thirteen. Ms. Owens testified that although she was presently "clean," in January of 2011, she had a drug problem involving "pills, meth, a lot of different things."

Ms. Owens testified that on January 31, 2011, she drove her van over to the defendant's house around 1:00 p.m. She testified that she picked up the defendant to "[j]ust ride around." During this period of time, the two were talking and doing drugs. The defendant had a backpack with him. She testified that the defendant was driving.

Ms. Owens testified that after they left, the defendant told her that they were going "[t]o make some money" and headed toward Highway 7. The defendant drove her to a specific house to which she had not been previously, and they parked in the front. Ms. Owens testified that the defendant exited the van and went to the front door of the house, while she remained inside. The defendant then entered the house using a screwdriver. Ms. Owens testified that she remained in the van for approximately five or ten minutes, and then she got out to retrieve the defendant.

Ms. Owens testified that she did not know what the defendant's plans were before they arrived at the house. Even after they arrived and she witnessed his forcible entry into the residence, she still did not "completely" know the defendant's plans—she simply "knew it wasn't right."

Ms. Owens testified that she entered the residence through the same door as the defendant. Once she entered the house, she walked through it until she reached the bedroom, where she saw the defendant "stealing and setting the house on fire." Specifically, she he saw the defendant putting objects into his backpack, including "Mule Day knives, little pocket knives." She also saw the defendant taking bottles of medication. After he had finished, she saw the defendant take a small yellow bottle out of his backpack, pour liquid from it onto some clothes, and ignite the mixture with a Zippo lighter. Ms. Owens testified that while witnessing this she backed out of the bedroom and asked the defendant what he was doing. He responded that "he was going to burn it."

-4-

Ms. Owens testified that she ran out of the house and back to the van. The defendant followed her less than a minute later. Ms. Owens testified that the defendant drove them away from the scene. When she asked the defendant why he had set the fire, he explained to her that the victim owed him some money.

Ms. Owens testified that they drove to her mother's house so that she could change her clothes and they could leave, arriving there around 3:00 p.m. Ms. Owens testified that after they arrived they encountered her brother. Her brother threatened the defendant, who threatened him in return. During this argument, she heard the defendant threaten to burn her brother's house down. Ms. Owens testified that she left with the defendant, and she never considered leaving or calling the police because she was afraid of him.

Ms. Owens testified that she and the defendant drove around for the remainder of the day using drugs. She testified that they used both marihuana and methamphetamine. The defendant was behind the wheel. She testified that they eventually stopped at an abandoned church, where they both slept in the van. The next day, she returned to her mother's house to shower, leaving the defendant asleep in the van. The left some hours later and she drove the defendant to met his girlfriend. After meeting Ms. Corley, the defendant left with her, and Ms. Owens did not see him again for a week.

During the intervening time, the defendant called her several times and requested that she bring him some CDs, but she did not do so because she was afraid of him. She eventually ran into the defendant while she was running errands, and she pulled over and gave him his CDs. After the exchange, she continued to stay away from the defendant out of fear for her safety. The defendant eventually caught up with her while she was parked at a Waffle house, and he got into her van.

Ms. Owens testified that the defendant had a knife in his hand. The defendant told her to drive, and she did so. The defendant told her where to turn as they drove. Ms. Owens testified that the defendant threatened her because he thought that she "was going to tell on him." She told the defendant that she would not do so. They eventually stopped at a local store, which was closed for the evening, and the defendant took over as driver. The defendant threatened her again and told her to get out of the van, and she did so. Then, the defendant pulled away in her vehicle before "c[oming] back at [her] like he was going to hit [her] with the car." He drove away afterward. Ms. Owens testified that she started walking home until she was eventually picked up by a stranger.

Ms. Owens testified that while she was on her way home she saw her van in the parking lot of a Baptist Church, surrounded by police. She asked for the stranger to drop her off there so that she could ask the police for assistance. The police brought her back to the

police station for questioning, where she gave two statements. Ms. Owens testified that in her first statement, she did not tell the police the whole story. She simply claimed to have dropped the defendant off at a church near the victim's house on the day in question. Ms. Owens testified that she lied in this statement because she was afraid of the defendant and of getting in trouble. Ms. Owens testified that she gave a second, truthful statement to police the next morning.

On cross-examination, Ms. Owens testified that the defendant never referred to the victim specifically by name. She first learned exactly whose house had burned down when her mother told her two or three days later, after reading about the fire in the paper. Ms. Owens testified that after arriving at the victim's house on the day in question, she made the decision to exit the van because she knew that the defendant had just broken into someone else's house, and she did not want to be sitting in the van with no keys if someone else came by. She testified that she got out to tell the defendant to "come on," because she did not want to get into trouble.

Ms. Owens denied that following the robbery, while she and the defendant were smoking weed and meth, she had ever suggested going through the victim's pills to see what she and the defendant had obtained. Ms. Owens also insisted that the only reason that she left the Waffle House with the defendant was because he had abducted her at knife point. She added that before he let her leave that evening, the defendant took away her shoes. Ms. Owens testified that numerous individuals knew that she was going to be at the Waffle House that evening, as she was going there to apply for a job. Ms. Owens testified that she told the police about the defendant abducting her, but she acknowledged that her written statement to the police made no reference to the abduction.

The witness was also questioned extensively concerning discrepancies between her two written police statements and her trial testimony. In particular, Ms. Owens was questioned concerning a statement that she made in her second written police statement that seemed to indicate that she had been the one who had driven the van to the victim's house, as well as a statement to the effect that the defendant had "told [her] in the beginning he was only going into the home to take medications." Ms. Owens testified that those statements had been misunderstood. Ms. Owens also denied telling various other individuals that someone other than the defendant had burned down the house. Before leaving the stand, Ms. Owens acknowledged that she had been charged concerning the theft of the victim's knives and medicines and that her case was still in General Sessions court.

Terry Dial, a detective with the Maury County Sheriff's Department, testified concerning his investigation into the burglary and fire. He testified that in the early stages of his investigation, he had a police report from Terry Owens concerning a threat made to

him by the defendant. He testified that he learned from Terry Owens that Tammy Owens' van was parked at a Baptist church. When he arrived there, he looked into the van through the window and saw a knife laying on the floor board. He testified that he photographed the knife through the window and contacted the victim, who identified the knife as belonging to him. Based on this information, he obtained a warrant to search the van. While he was in the process of doing so, he was informed that Tammy Owens had shown up at the van, and he "had her standing by" there until he arrived. Detective Dial testified that nothing else related to the crime was recovered from the van. Detective Dial also testified in detail concerning his subsequent interviews with Ms. Owens.

Detective Dial testified that after he received Ms. Owen's second written statement, he and another detective went back to the victim's residence and re-examined the door through which Ms. Owens claimed that the defendant had gained entry. They found marks on that door. Detective Dial testified that these marks were consistent with a tool having been pushed into the door. Detective Dial also testified that a blue backpack was discovered during a search of the defendant's home.

On cross-examination, Detective Dial testified that a fingerprint was recovered from the knife discovered in Ms. Owens' van. When he sent the fingerprint to be analyzed, the results indicated that it did not belong to the defendant.

Special Agent Robinson with the State Fire Marshall's Office testified that he investigated the fire in question. He testified that he searched for the fire's point of origin by studying the fire's movement and "intensity patterns." He testified that he determined that the fire started in the master bedroom based on the pattern of the fire damage. More specifically, he determined that the fire had started at a chest of drawers, which was located in the middle of the bedroom floor and which had all of its drawers taken out. He testified that he discovered no potential accidental sources of ignition. He testified that he ultimately determined that the fire had been caused by arson, and he filed a report to that effect, which was entered into evidence.

Special Agent Robinson testified that after processing the crime scene and filing his report, he had an occasion to speak with Ms. Tammy Owens, who gave him some information concerning the fire. He testified that the information provided by Ms. Owens concerning the fire's origin matched up identically with what he had determined through his investigation.

Ms. Melissa Osann, a close friend of the victim's, testified that she knew the defendant because she had met him on a few occasions. She testified that she saw the defendant on October 1, 2011, at the defendant's brother's house. On this occasion, the

defendant pulled several "Mule Day" knives out of a "Walmart" bag and asked her if she would like to purchase one. She declined and asked the defendant where he had obtained them. The defendant replied that it was none of her concern. Ms. Osann testified that the defendant later said something to the effect that he "wouldn't have gotten the knives if they wouldn't have fucked [him] over." Ms. Osmann testified that either later on that day or on the following day the defendant further told her: "The son of a bitch owed me money, and that's why I burned the house down." She testified that the defendant was serious when he made the statement.

Mr. Randall Kirk Nelson, a microanalysis expert with the Tennessee Bureau of Investigation, testified that he tested a sample of material represented to him as coming from the scene of the fire and determined that it contained a "product." He testified that this product could not be positively identified or classified due to the deteriorated condition of the sample. He specified that while he did find "certain chemical compounds within the sample . . . that [he] would typically expect to find within some sort of ignitable liquid residue," he "c[ould not] say with any certainty that there [wa]s an actual ignitable liquid or not." His expert report concerning his analysis of the sample was entered into evidence.

Following this testimony, the State closed its case-in-chief. The defendant was advised of and waived his right to testify in his own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The defendant's girlfriend, Ms. Lourie Corley, was recalled as a witness for the defense and testified that she had a conversation with Ms. Melissa Osann at the defendant's mother's house on or near September 20, 2011. Ms. Corley claimed that in this conversation Ms. Osann indicated that she was very good friends with the victim and his wife and that the victim's wife had told her that the two of them had plotted to burn their house down for the insurance money.

Following this testimony, the parties gave closing arguments, and the jury was instructed. Among other instructions, the trial court instructed the jury that it was their duty to determine whether Ms. Tammy Owens was an accomplice to the crimes charged. The trial court further instructed the jury that the defendant could not be convicted based on the testimony of an accomplice by itself. The trial court explained that an accomplice's testimony must be supported by other evidence, and "[t]his other evidence must independently lead to the conclusion that a crime was committed; and that the defendant was involved in it. . . . The supporting evidence is enough if it fairly and legitimately tends to connect the defendant with the crime charged." After being instructed, the jury retired to deliberate at 4:40 p.m. on November 3, 2011. The jury returned shortly before 7:00 p.m. that same day with a verdict finding the defendant guilty as charged.

On December 15, 2011, the trial court sentenced the defendant as a Range I, standard

offender to twenty years for the arson conviction. The trial court sentenced the defendant as a Range II, multiple offender to six years for the aggravated burglary conviction and to four years for the theft conviction. The trial court ordered all sentences to run concurrently, leaving the defendant with a total effective sentence of twenty years.

The defendant filed a motion for new trial, which was denied by the trial court following a hearing. The defendant filed a notice of appeal on April 20, 2012. Satisfied that the defendant's appeal is properly before this court, we proceed to address his claims.

## ANALYSIS

The defendant claims that the evidence is insufficient to support his convictions and that the trial court erred by failing to instruct the jury that Ms. Tammy Owens was an accomplice as a matter of law. For the reasons that follow, we deny both claims.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence presented at trial was insufficient as a matter of law to support his convictions. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[O]n appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Carl J. Wagner*, No. M2010-00992-SC-R11-CD, 382 S.W.3d 289, ___ (Tenn. Oct. 12, 2012). Reviewing courts should neither re-weigh the evidence nor substitute their own inferences for those drawn by the jury. *See id.*

The defendant in this case was convicted of aggravated arson, aggravated burglary, and theft of property worth $1000 or more but less than $10,000. "A person commits [arson] who knowingly damages any structure by means of a fire or explosion." T.C.A. § 39-14-301. Arson becomes aggravated "[w]hen one (1) or more persons are present therein." T.C.A. § 39-14-302(a)(1). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault." T.C.A. § 39-14-402(a)(1). "Aggravated burglary is burglary of a habitation." T.C.A. § 39-14-403. Habitation "[m]eans any structure, including buildings, module units, mobile homes, trailers,

and tents, which is designed or adapted for the overnight accommodation of persons." T.C.A. § 39-14-401(1)(a). Finally, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Theft is a "Class D felony if the value of the property or services obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)." T.C.A. § 39-14-105(a)(3).

At the outset, we note that the testimony of Ms. Owens, if credited, is sufficient to support a jury finding that the defendant satisfied virtually all the necessary elements of each offense. Ms. Owen's testified that she witnessed the defendant break into the victim's house using a screw driver. She testified that she witnessed the defendant inside, removing items he found there and stuffing them into his backpack. She testified that she saw the defendant pour a flammable liquid onto some clothes and ignite the mixture. Her testimony concerning the circumstances surrounding these acts, and her testimony concerning various statements made by the defendant during and following these acts, is sufficient to give rise to a permissible inference that the defendant acted intentionally when he entered the victim's residence, set a fire inside, and stole the victim's property.

The only essential element of the defendant's crimes not fully established by Ms. Owen's testimony is the value of the items stolen by the defendant. However, the victim testified that the value of his missing knife collection was between $1,500 and $2,000. His testimony, if credited by a jury, sufficed to establish that the defendant was guilty of theft of property valued at $1000 or more but less than $10,000.

The defendant argues that the evidence is insufficient to support his conviction because Ms. Owen's "testimony raised serious questions about her credibility." The defendant points out that Ms. Owens claimed to see the defendant taking prescription pills from a night stand, while the victim testified that his medicines were located in a dresser drawer. The defendant claims that Ms. Owens testified that she did not see the defendant do anything to the front door as he left the victim's house, yet all the doors to the victim's house were discovered to be locked when a passerby first investigated the fire. The defendant points out that the only stolen item ever recovered from the theft was a knife, and that knife bore someone else's fingerprint.

These arguments are misplaced. As we have discussed, this court does not re-weigh conflicting evidence on appeal, nor does it substitute its own inferences for those drawn by the jury. Affording the State the strongest legitimate view of the evidence and drawing all inferences in its favor, *see Dorantes*, 331 S.W.3d at 379, the evidence produced by the State at trial was sufficient for a reasonable jury to find the defendant guilty beyond a reasonable doubt on all charges. The defendant's claim that the evidence is insufficient to support his

convictions is denied.

## II. Accomplice Instruction

The defendant claims that the trial court erred by failing to instruct the jury that Tammy Owens was an accomplice as a matter of law. The defendant points out that "it is well-settled that a defendant cannot be convicted on the uncorroborated testimony of an accomplice," *State v. Ballinger*, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2000), and claims that the State failed to provide such corroborating evidence. We find this claim to lack merit.

The test for determining whether a trial court should instruct a jury that a particular witness is an accomplice as a matter of law is straightforward. If "it is clear and undisputed that the witness participated in the crime," then a trial court ought instruct the jury that the witness is an accomplice. *Id*. If, however, the witness denies participating in the crime and/or the facts are in dispute or susceptible to different interpretations, then "the question of whether he or she is an accomplice is one of fact to be submitted to the jury with proper instructions from the court on how to consider such testimony." *Id.* at 887-88.

The record is clear that Ms. Owens disputed her status as the defendant's willing accomplice. Her testimony at trial was that she did not know that the defendant was going to steal, burglarize, or set fire to the victim's house until after she discovered him accomplishing those very acts inside. She testified that when she saw the defendant committing those criminal acts, she asked him why he was doing them. She testified that she stayed with the defendant after he committed the criminal acts only out of fear for her own safety. Simply put, no portion of Ms. Owen's trial testimony can be reasonably construed as a concession that she willing participated in the defendant's crimes.

The defendant directs our attention to Ms. Owens' written statement to police, in which she made statements that appear to concede that she had advance knowledge of the defendant's intent to commit theft (at least). For example, Ms. Owens stated to the police that the defendant "told me at the beginning he was only going into the home to take medications." Had Ms. Owen's trial testimony echoed some or all of the seemingly inculpatory statements contained in her written police statement, this court might confront a different set of facts. However, as the record stands, these prior inconsistent statements served, at most, to call the credibility of Ms. Owens' trial testimony into question and raise a factual dispute concerning her status as an accomplice. The trial court properly submitted this factual dispute to the jury and gave the appropriate instructions. By its verdict, the jury either resolved the issue of whether Ms. Owens was an accomplice against the defendant, found that Ms. Owens' testimony was sufficiently corroborated by other evidence, or both.

Even had the record reflected Ms. Owen's undisputed status as a willing participant in the defendant's crimes—thereby rendering the trial court's failure to instruct the jury that Ms. Owens was an accomplice an error—the defendant would still not be entitled to relief. It is well-established that even when record evidence exists that would support a finding that a witness is an accomplice, and the trial court fails entirely in its duty to instruct the jury concerning accomplice testimony, such an error is subject to harmless error analysis. *See id.* at 888. It necessarily follows that a lesser instructional error—such as permitting the jury to determine whether or not a witness is an accomplice rather than instructing them that the witness is to be deemed an accomplice—is also subject to harmless error analysis. We will find such an error to be harmless when "the record contains sufficient corroboration to [the accomplice's] testimony." *Id.*

The State presented sufficient evidence at trial to corroborate Ms. Owens' testimony. "[C]orroborating evidence is sufficient if it connects the accused with the crime in question." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Ms. Owen's brother testified that he saw the defendant in the company of his sister less than an hour after the fire and that the defendant became hostile during this encounter and threatened to burn down his house. Ms. Osann testified that the defendant later admitted to her that he "burned the house down" because the "son of a bitch owed me money." This testimony sufficiently connects the defendant to the crimes at issue. Consequently, any failure to properly instruct the jury concerning Ms. Owens' status as an accomplice or the need for her testimony to be corroborated would have been harmless. The defendant's claim that the trial court erred by failing to instruct the jury that Ms. Owens was an accomplice as a matter of law is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-12-