# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 5, 2013

## STATE OF TENNESSEE v. LUIS GUILLEN

**Appeal from the Criminal Court for Shelby County**
**No. 10-04491    Lee V. Coffee, Presiding Judge**

**No. W2012-00826-CCA-R3-CD  - Filed August 2, 2013**

The defendant, Luis Guillen, was found guilty after a trial by jury of one count of aggravated rape, a Class A felony, and one count of aggravated kidnapping, a Class B felony.  He was sentenced as a violent offender to twenty-five years for the aggravated rape and to a consecutive ten years for the aggravated kidnapping, for a total effective sentence of thirty-five years.  On appeal, the defendant claims that the evidence is insufficient to support his convictions and that his sentence is excessive.  After reviewing the record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Juni Ganguli, Memphis, Tennessee, for the appellant, Luis Guillen.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Marques T. Young and Ann Schiller, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On July 29, 2010, the Shelby County Grand jury indicted the defendant on one count

of aggravated rape in violation of Tennessee Code Annotated section 39-13-502 and three counts of aggravated kidnapping in violation of Tennessee Code Annotated section 39-13-304. All four allegations were based on the defendant's treatment of the victim, over a four-day period commencing two days after Christmas 2009. At the defendant's trial on January 9-13, 2012, the following evidence was presented:

The victim, testifying with the assistance of an interpreter, stated that she presently lived in Memphis, although her country of origin was Mexico and her native language was Spanish. She testified that she was introduced to the defendant through a friend and that the two started dating sometime in February or March of 2009. She testified that they had never lived together. The victim testified that at the beginning of the relationship, the defendant was a "nice guy."

The victim testified that on Sunday, December 27, 2009, the defendant picked her up to go get something to eat, and they went to his apartment. After arriving there, they "hung out" for a while, and at around 8 p.m., she received a text message on her cell phone. Before she could see who the text was from, the defendant took her cell phone away from her. He informed her that the text message was from an area code in Florida and accused her of seeing someone else who was sending her text messages. The two briefly struggled over possession of the phone, and the defendant threw her against a wall. Afterward, the defendant asked her if the person who had sent the text to her knew her and if he had seen her lately. The victim replied that she had not seen the person who had sent her the text—an individual that she knew from Mexico whose name was Rico—for many years.

The victim testified that the defendant called the phone number associated with the text message and talked with the individual on the other end of the line. The defendant left the apartment during this phone conversation. The victim testified that when the defendant returned, he pulled her hair, called her a "bitch," and told her that he was going to send her to hell and that she would not return. The victim testified that the defendant pulled her by her hair into the bedroom, where he threw her into a chair and proceeded to punch her in the face numerous times, holding her head back by her hair with his other hand the entire time. The victim testified that the defendant continued to strike her in the face until she was bleeding, and he refused to let her go. The victim testified that the defendant only stopped beating her when he became concerned that her blood was staining his carpet.

The victim testified that she was dizzy after being beaten. She testified that she went into the bathroom to wash her face, "but the bleeding did not stop." Eventually, the bleeding slowed, and the defendant threw her on the bed and told her that they were going to have sex. However, he stopped when the victim's bleeding started to increase again. The victim testified that the defendant then retrieved a belt from his closet, which he folded in half

before demanding that she perform oral sex on him. When she informed the defendant that she could not do so, the defendant struck her repeatedly on the back with his belt. The victim testified that she could not remember how many times she was struck.

The victim testified that when he was finished, the defendant threw her on the floor and took her clothes off. The victim testified that she struggled after the defendant got on top of her, but the defendant was stronger than she was. She testified that the defendant's penis penetrated her vagina. The victim testified that she did not want to have sex with the defendant and that she informed the defendant of this fact. She testified that the defendant informed her that she was "going to be with him, even if [she] didn't want to." The victim testified that the defendant held her so that she could not escape and that she was afraid that even if she did succeed in escaping, the defendant would only beat her more. The victim testified that after the sex act was finished, the defendant was happy that he had been able to do whatever he wanted to do to her.

The victim testified that after the intercourse was over, she asked the defendant to take her back to her apartment. The defendant replied that she was not going back to her apartment because she was cheating on him. She testified that she told the defendant to "go to hell," and he responded "go fuck yourself." The victim testified that the defendant told her that he was not taking her back to her house and that no one was going to help her.

The victim testified that there was another individual, named "Obed," who was located in the apartment in another bedroom when the defendant first started shoving her. She testified that she did not know if that individual was still in the house after she was pulled into the defendant's bedroom. The victim testified that she never sought assistance from "Obed" because the defendant specifically warned her not to ask him for help, and she was afraid that the defendant would hit her again if she tried.

The victim testified that she stayed with the defendant in his bedroom the entire night, but she did not sleep. She testified that she was in extreme pain and that her head was hurting. She testified that the defendant lay down next to her, but she was never sure whether or not he had fallen asleep. She testified that the defendant would notice whenever she moved. She testified that in the morning, she asked the defendant to take her home so that she could go to work. The defendant refused. She testified that she told the defendant that she felt bad and asked him to take her to a doctor. She testified that the defendant replied that he was "not a fool" and that a doctor would ask what had happened to her. She testified that she spent the entire day that Monday in the defendant's bedroom sitting on the bed. She testified that the defendant did not go to work that day and that she believed that he never left the apartment. She testified that the defendant occasionally left the bedroom, but when he did so he would always shut the door behind him, and she could not be sure of his location.

The victim testified that she had nothing to eat all day and nothing to drink except for the water from the defendant's bathroom sink. She testified that she was hungry and in pain throughout the day and that her nose would start bleeding again if she touched it.

The victim testified that when he left, the defendant left her cell phone in the bedroom on one occasion. She testified that she used it to try to call an individual named "Belen," but she received no answer. She testified that next she called an individual named "Marisol" to tell her that she would not be coming to work. She testified that she did not ask "Marisol" for help because she was afraid the defendant would hear her and beat her again. She testified that the defendant did not leave the room for very long. She testified that she spent Monday night in bed with the defendant again, and that again she could not sleep because of her pain. She testified that she thought of trying to run away, but once again she could not be sure that the defendant had fallen asleep and that every time she moved, he would notice.

The victim testified that on Tuesday morning she again asked the defendant to take her home so that she could go to work, and he again refused and told her to quit bothering him. She testified that she never left the defendant's bedroom that day. She testified that the defendant would leave the bedroom for short periods, taking her cell phone with him and only leaving it in the bedroom to charge. She testified that at one point the defendant showed her a text from her sister asking her if she needed help and offering to call the police. She testified that she could not respond to this text because the defendant had her phone. She testified that she asked the defendant to return her phone so that she could text her sister because her family was going to be looking for her. The defendant replied that he did not care and that if anyone came looking for her, "he would do something to that person . . . and then he would leave the state." Later that day, her brother called her cell phone, and the defendant answered. The defendant gave her the phone and stood next to her shoulder listening to the conversation as her brother asked her if she was okay. She testified that she was afraid if her brother came there that the defendant would hurt both him and her.

The victim testified that sometime Tuesday afternoon, the defendant offered her some bread and coffee, and as evening approached, she and the defendant drank beers. She testified that her sister-in-law called about thirty times during that day because she had previously told her that the defendant was going to take her home on Tuesday night. She again asked the defendant to take her home, and the defendant accused her of only wanting to leave so that she could "go with someone else" and informed her that no matter where she went, he would look for her, find her, and kill her.

The victim testified that she tried to pretend to be happy so that the defendant would release her. After she consented to have sex with the defendant that evening, the defendant finally agreed to take her home on Wednesday morning, on the condition that he would be

the one taking her to work and dropping her off from then on. She testified that they had intercourse that evening and that she would have done almost anything he asked in order to leave. She testified that she was still hurting and extremely tired. The defendant eventually took her home around 5:30 p.m. that evening. She testified that the defendant was happy when he dropped her off. He never returned her cell phone.

The victim testified that "Belen" was at her apartment with her baby when she arrived. She knocked on Belen's bedroom door and informed her that the defendant had hit her. She borrowed Belen's cell phone to call her brother. After speaking with "Marisol," the police arrived at her apartment shortly afterward. The police took her to a clinic, where she was given a hamburger and an orange.

From the stand, the witness authenticated photographs of her that were taken while she was at the clinic. These pictures were entered in evidence. Using them, the victim identified various injuries that she had received, including a large bruise on her left eye, and she explained that the defendant had inflicted these injuries when he struck her. She testified that her injuries were very painful.

The victim testified that after her medical examination she spoke with the police. She testified that the police showed her a photographic array that included the defendant's picture, and she identified the defendant is the individual who had assaulted, raped, and kidnapped her. While on the stand, the victim also opened up an evidence bag containing a cell phone. She identified that cell phone as belonging to her and testified that the last time she had seen it prior to preparing for her testimony was in the possession of the defendant in December 2009.

On cross-examination, the victim testified that she met with the defendant once or twice a week during the time period that they were seeing each other. She testified that she was familiar with the defendant's apartment. She testified that she was also familiar with the defendant's roommate "Obed," a Latino male whose last name she did not know. The victim testified that during early 2009, she had been living with her brother, but sometime afterward she moved out and moved in with a woman named Marisol Corado, with whom she was friends. She testified that on the night of the incident, she was living with another woman named "Belen" and that the defendant picked her up from Belen's apartment that evening. She testified that she and the defendant went to dinner, and afterwards they went back to the defendant's apartment. She testified that when they arrived at the defendant's apartment, the defendant's roommate Obed was present.

She again testified that although the defendant's roommate was present in the apartment when the defendant began to pull her, she did not know whether or not the

roommate remained in the apartment during the attack. The victim acknowledged that none of her clothes were torn after the assault, even though the defendant had used force to remove them. She testified that the pants she was wearing did not tear during the assault and that the defendant did not remove her T-shirt.

The victim testified that she was not aware that the defendant had left the apartment on Monday morning for half an hour to take a woman named Flor Vecente to work. She testified that throughout the ordeal, the defendant would leave the bedroom for short periods of time, but she never felt that she had enough time to escape. She also testified that she did not have a vehicle and was afraid to attempt to flee on foot. The victim acknowledged talking to various individuals during the time period that she was in the defendant's apartment but testified that she was afraid to ask for their assistance because the defendant was right next to her and could have beaten her further. The victim testified that she was not familiar with 911 as a number that could be used to summon emergency response services. She also testified that she did not know the defendant's address (even though she admitted that she had been to the defendant's apartment many times in the past) and that she was afraid that she would not be able to communicate with any police that might arrive because she did not know English.

The victim testified that she and the defendant had been intimate on prior occasions, and the last time that they had been intimate had been on Christmas Eve three days earlier. She testified that she and the defendant had intercourse on the night of the incident, but only after he had beaten her. She testified that the second act of intercourse, which she had with the defendant on Tuesday night, was consensual but done for purposes of enticing the defendant to take her home.

On redirect examination, the victim testified that she was afraid to ask Obed for help, because she believed that the defendant and Obed were friends and Obed might simply tell the defendant that she had done so. She also clarified that she had never been offered or consumed any beer during the time she spent at the defendant's apartment. The victim clarified that only the defendant and Obed had been drinking beer and claimed that she did not drink beer in general.

Sergeant Eric Gilliam of the Memphis Police Department testified that he investigated sex crimes and that he had been with the department for twenty-two years. He testified that he primarily investigated rapes and kidnappings, and that he investigated the incident that occurred between the defendant and the victim on December 27-30, 2009. He testified that he spoke with the victim with the assistance of a Spanish-language translator. He testified that during his investigation, he showed a photographic array to the victim containing the defendant's picture, and she identified the defendant as the individual who had assaulted and

raped her.

Ms. Susana Parkinson, an intervention specialist at the Memphis Sexual Assault Resource Center, testified that she assessed sexual assault victims for trauma reaction and prepared them for forensic exams. She testified that she had personally assessed over one thousand clients. After detailing her qualifications and experience, she was qualified as an expert in sexual assault victim investigation. She testified that in her experience, many victims of sexual assault suffered from a condition that she described as "acute rape trauma syndrome," psychological trauma that disrupts the victim's normal physical cognitive functions. She testified that this syndrome can manifest itself in many different ways, with some victims acting hysterical or tearful and others appearing numb or withdrawn.

Ms. Parkinson testified that she treated the victim on December 30, 2009. She testified that she did not receive any notice from dispatch that the victim was on her way to center, and as a consequence, there was no nurse at the facility. She testified that the lack of a nurse on site that day caused her great concern because of the physical injuries that she observed on the victim when she arrived. She testified that the victim's nose began bleeding around a half hour after the victim's arrival. She testified that she had never treated a rape victim at the Center who was in the victim's condition; normally, a victim with her injuries would have been taken to the emergency room. She testified that the victim appeared terrified throughout the intake process and was crying intermittently. She testified that during the intake process the victim reported to her that she had been contacted by her former boyfriend and invited to dinner, but that instead, he took her over to his apartment, where he physically assaulted her and raped her over a period of two or three days.

Ms. Parkinson testified that in her experience it was not unusual for a victim of domestic violence rape to fail to ask for help if she talked with someone. Ms. Parkinson testified that people experiencing rape trauma syndrome may fail to function as they normally would, and often feel powerless and overly concerned with a desire to not create any additional problems for themselves. She testified that acute rape trauma syndrome can last for a period of weeks or months following the initial incident. In addition, Ms. Parkinson testified that it was not unusual for a rape victim to consent to sex with her rapist while still being held captive. She testified that it was clear to her from her interview with the victim that the victim feared that she was not going to survive the incident and that this feeling might have led her to consent to sex. In addition, she testified that individuals who are sexually assaulted by their partner may be susceptible to "brainwashing" by that partner.

Finally, Ms. Parkinson testified that the victim was still in the acute stage of rape trauma during her time at the Center. Ms. Parkinson testified that the victim's behavior and demeanor while at the Center were completely normal for a rape victim in the acute phase

of rape trauma syndrome.

On cross-examination, Ms. Parkinson testified that during her investigation she did not speak with anyone else who was in the apartment at the time of the assault. Ms. Parkinson also testified that she was unaware of the nature of the relationship was between the victim and the victim's brother. She testified that the victim did not appear to be afraid of her brother, but the victim did indicate that she was concerned about her family finding out that she was pregnant with the defendant's child.

Ms. Elizabeth Thomas, a nurse at the University of Memphis who specialized in sexual assault examinations, testified that she had been practicing for nineteen years and that she had treated more than three thousand sexual assault victims. After detailing her qualifications, she was qualified as an expert. Ms. Thomas testified that she had treated the victim and remembered the victim because of her injuries. She testified that she treated many rape victims who bore no injuries, not even redness or tears in the vaginal area, after their rape. She testified that when she saw the victim, she immediately noticed extreme injuries to the victim's face, neck, and head. She testified that the victim's nose was bleeding and her eyes were red, which was a "red flag" to her indicating likely head trauma. While on the stand, the witness was shown several photographs of the victim taken on the day that she arrived at the trauma center. She detailed some of the victim's individual injuries using these photographs, pointing out bruising and petechiae on the victim's temple and an area containing a dark bruise that was indicative of fairly recent blunt force trauma applied to the victim's head.

Ms. Thomas testified that initially, she was not sure whether to attempt to treat the victim at the Center or send her on to a hospital before collecting evidence. Eventually, she took the victim into an exam room, where the victim communicated to her in broken Spanish/English. She testified that she was able to understand that the victim was afraid that the person who had done this to her was going to break out of jail and come and kill her and her family. She testified that the victim's demeanor during this time period was confused and anxious. Ms. Thomas testified that she conducted an examination of the victim using a rape kit, and afterward, she sealed the kit and had it sent to the Tennessee Bureau of Investigation for further analysis. Ms. Thomas testified that she prepared a report of her examination, which she identified in which was entered into evidence.

Ms. Thomas testified that there was yellow and purple bruising on the victim's hand, and it was obvious to her that the victim had received blows in that location. Based on the color of the bruising, Ms. Thomas testified that the bruises appeared to be at least 36 hours old. Ms. Thomas testified that the anterior portion of the victim's hand was almost solidly bruised. Ms. Thomas testified that in her experience, this type of bruise was a defensive

wound. Ms. Thomas testified that the victim also had bruising on the backside of both of her arms. Ms. Thomas testified that this "parallel bilateral bruising" was consistent with the victim having been held down or forced against something. Ms. Thomas testified that the victim's bloodshot eyes were caused by the application of a great deal of force. She testified that they could not have been caused by mere slapping.

Ms. Thomas testified that the victim had no visible injury to her vaginal or anal areas. She testified that she took a swab of some "chalky residue" that she found on the victim's left thigh and sent it along for further analysis. Ms. Thomas testified that the victim had informed her that she had not been able to take a shower since the assault. Ms. Thomas testified that after completing her examination, she had still been unable to get the victim's vital signs under control or stop the bleeding from the victim's nose. Ms. Thomas testified that, consequently, she sent the victim to the emergency room at St. Francis Hospital for facial x-rays. She testified that the professionals at the hospital took over the victim's care from that point on.

In conclusion, Ms. Thomas testified that the victim arrived at the Center in far worse condition than other rape victims. She testified that she would classify the victim as having suffered extreme trauma.

On cross-examination, Ms. Thomas again testified that she observed no injuries to the victim's genitals or legs during her examination. Ms. Thomas testified that she did not swab the victim's fingernails for DNA. Ms. Thomas acknowledged that not every person who has been beaten has also been raped. Following Ms. Thomas' testimony, the parties stipulated that the DNA collected from a swab of the victim was a match with the DNA of the defendant. Then the State rested.

Ms. Florildalma Vecente testified for the defense and stated that she worked with the defendant in December of 2009 scanning products at the local Pinplex factory. She testified that on Monday, December 28, 2009, the defendant drove her to work in his car. She testified that he picked her up at her apartment at around 7:40 a.m. in the morning and that the drive took around ten to fifteen minutes. She testified that he also picked her up from work at the end of the day and drove her home, again taking around ten or fifteen minutes to do so. She testified that there was nothing unusual about the defendant's behavior on that day. She testified that the defendant also drove her to work on Tuesday.

On cross-examination, Ms. Vecente testified that she had known the defendant for about a year prior to his recent arrest. The witness testified that she and the defendant punched in and out of work at the same location. She testified that on most days, she and the defendant would punch in together at the same time. She testified that on the Monday in

question, she could not remember whether the defendant had punched in. She testified that on Monday afternoon the defendant did not punch out with her, and she did not see him punch out. She testified that she was not sure whether the defendant had taken a vacation day on Monday.

Mr. Obed Merida testified that he and the defendant were renting an apartment together during the December of 2009. He testified that they had been living together for approximately five months. He testified that the front door to their apartment was locked with a normal doorlock and could be opened from the inside simply by turning the lock.

Mr. Merida testified that he did not know the victim by name, but he was aware that the defendant had a girlfriend and knew her by sight. He testified that sometime in December, he arrived home from a meeting, and he had a discussion with the defendant concerning his girlfriend. He testified that he had seen the defendant's girlfriend in the apartment the day before, and he asked the defendant if she was going to live with them. He testified that the defendant told him that he and the victim had argued and that he had hit her. He testified that the defendant stated that the victim had a red eye and asked him if he knew of anything that would get rid of the red coloration. He testified that he and the defendant went to a Mexican store about five minutes away to look for something to put in her eyes, and then they continued on to a Walgreens, taking about 30 minutes in all. He testified that they returned to the apartment afterward, and he heard the defendant's girlfriend in the defendant's room.

Mr. Merida testified that later that evening, the defendant came into his bedroom alone. He testified that the defendant was not carrying a cell phone with him. He testified that he heard the sound of a cell phone ringing, and he believed it that it was the victim's cell phone because the defendant did not own one. He testified that the phone was continually ringing. He testified that while he was in the apartment, he noticed that the defendant's bedroom door was open. He testified that he looked inside and saw the defendant's girlfriend lying on the bed. He testified that he never saw the defendant's girlfriend's face, and he never looked at her.

On cross-examination, Mr. Merida testified that he generally worked hard and would usually come home tired. He testified that his usual practice was to eat something and then go to bed. He testified that he would hang out with the defendant once or twice a week. He testified that he did not know the defendant's girlfriend's name because they both referred to her using the Spanish word for "shorty." He testified that he did not speak to the defendant's girlfriend often, because the defendant was jealous and had asked him not to speak with her. The witness testified that because he never spoke with the defendant's girlfriend, all of the information that he had concerning the victim came from the defendant.

-10-

He testified that he never saw the victim beaten up, and he only knew that the defendant had beaten the victim because the defendant had told him so. He testified that on the last day that he saw the victim, she walked by his doorway closely followed by the defendant. He testified that he asked the defendant on his way out if his girlfriend was happy to be there. He testified that the defendant replied that she was happy and that they had just had sex. He testified that he never spoke to the victim that morning.

Ms. Doly Marisol Corado testified that she lived in Memphis and worked as a domestic servant. She testified that she had previously lived with the victim, after the victim had moved into her apartment following an argument with her brother. She testified that she was still living with the victim on occasion during the December of 2009, although she had gotten the victim another apartment to live in with other people. She testified that one of these other people was named "Belen."

Ms. Corado testified that on Monday, December 28, 2009, she received a phone call from the victim between 9 a.m. and 11 a.m. in the morning. She testified that this phone call lasted five to seven minutes. She testified that the victim did not report that she had been raped and was still being held captive during this phone call. She testified that she received an additional call from the victim about two or three hours later, and a third call sometime in the afternoon. She testified that she asked the victim why the victim did not go to work, and the victim responded that she did not go to work because the defendant had beaten her. The witness testified that she called the victim back an additional time to see if she was okay and to ask her if she wanted her to call her brother or the police. She testified that the victim told her no. She testified that she offered to go pick the victim up herself, but the victim responded that she should not do so because the defendant would hurt her. She testified that the victim had never told her that she had been hurt by the defendant at any point prior to this incident.

On cross-examination, Ms. Corado testified that following his arrest, the defendant called her and asked her to tell the victim to drop the rape and kidnapping charges, explaining that he was in love with the victim. She testified that the defendant informed her that he and the victim were going to have a child and that the victim was three months pregnant.

The witness also testified concerning the one time that the victim had brought the defendant to her apartment. She testified that the victim introduced the defendant as her boyfriend. The witness testified that the defendant "made a bad impression on me because of the tattoos on his face." The witness testified that she told the victim to be careful.

Ms. Corado also testified further concerning her phone calls with the victim on the Monday in question. She testified that the phone calls ended when the victim got very quiet

and did not talk much. She testified that she found this to be strange, and she asked the victim why the victim would call her if she was not going to speak. She testified that the victim did not reply. She testified that, at the end of the second or third phone call, the victim told her that she could not speak and hung up the phone after saying "he's coming, he's coming." The witness testified that there were something that bothered her about the victim's voice during the phone calls. She testified that she eventually called the victim's brother, but they did not know the defendant's address. She testified that over the next day or so, she and the victim's brother drove around in a car looking for the victim.

Ms. Corado testified that she saw the victim on the morning of Wednesday, December 30, 2009. She testified that the victim had visibly been beaten, so she called the police. She testified that she watched the victim leave to go to a clinic. She testified that a short time afterward, she received a phone call from the victim's phone. She testified that the defendant was on the other end of the line, asking her what was going on. She testified that the defendant asked her if she had taken the victim to work. She testified that she told the defendant that she did not know the victim's whereabouts. She testified that the defendant stated that the police were coming and hung up the phone. She testified that she received another phone call from the defendant while he was in jail, asking her to tell the victim to drop the rape and kidnapping charges.

Finally, the defendant took the stand in his own defense and testified that he was dating the victim during 2009. He testified that the victim was ten years older than he. He testified that he saw the victim fairly regularly, and they had sex fairly regularly. He testified that the victim lived at two different apartments with two different friends, Belen and Marisol, and that he would pick her up from both locations. He testified that around 6:30 p.m. on December 27, 2009, he picked the victim up from Belen's apartment, and the two went to dinner at a Waffle House. He testified that they ended up back at his apartment, where they lay down in bed and watched some movies. He testified that they began to have sex during a movie. He testified that his roommate was not present in the apartment at this time because he was at church.

The defendant testified that after they finished having sex, the victim received a text message. He testified that he asked the victim who had sent the text, and she replied that she did not know. He testified that he felt bothered, jealous, and angry. He testified that he lost control and beat the victim, even though he loved her and was aware that she might be pregnant. He testified that he did not know how many times he had hit the victim. He testified that he stopped beating the victim when he realized that what he was doing was wrong. The defendant testified that he fell asleep afterward. He testified that he did not take the victim to the emergency room because he did not want to go to jail.

The defendant testified that he woke up on Monday morning and offered to get the victim something to eat. He testified that he eventually gave the victim some coffee with sweetbread. He testified that afterward, he left the apartment to take a friend to work. He testified that he left the victim's cell phone with her in the apartment when he left. He testified that he did not go to work himself on that day because the victim did not want to stay at his apartment by herself. He testified that he was gone for a total of thirty or forty minutes, and when he returned the victim was in his bedroom watching TV.

The defendant testified that the outer door to his apartment could be opened from the inside simply by turning the handle and that his bedroom door opened and closed from both sides. He testified that anyone inside his apartment could open the door and walk out without a key. He testified that he and the victim spent the entire day together watching TV and talking, and he left again in the afternoon to go pick his friend up from work. He testified that his roommate asked him to leave the apartment again that evening to go to the store and buy him some food, and that he was gone for thirty-five or forty minutes. He testified that while he was out picked up some painkillers for the victim. He testified that he took his friend to and from work again on Tuesday, and he was gone for about forty minutes each time. He testified that he took vacation days on Monday and Tuesday "[b]ecause it was almost the end of the year, and if [he] didn't take [his] vacation [he] was going to lose it. . . ."

The defendant testified that on Tuesday night, he drank beer with his roommate outside the door of his bedroom. He testified that he was not proud of the fact that he had been drinking while his girlfriend had blood in her eyes. He testified that he did not have sex with the victim on Tuesday night. He testified that on Wednesday morning, the victim asked him to take her home for the first time so that she could go to work. He testified that he took the victim to Belen's apartment. He testified that when he took the victim home, the victim left her cell phone in the chair of the car.

On cross-examination, the defendant testified that he had joined a gang when he was fourteen or fifteen years old. He testified that the name of the gang was Sorrenos 13, and the gang was "big" in Texas, California, and internationally. He testified that the gang was responsible for murders, rapes, and robberies, but that he had never done "anything like that." He testified that the teardrop tattoos on his face were simply part of joining the gang and had no particular significance. He testified that his local "clique" of the gang performed acts of goodwill, such as helping old women take groceries to the car.

The defendant testified that he had never told his roommate not to talk to his girlfriend and that his roommate had been lying when he had testified that the defendant had warned him against talking to her. He testified that the victim had a bag with her the entire time she

-13-

was at his apartment, which contained toothpaste, deodorant, fingernail polish, and things of that nature. He testified that the victim had a bathroom available to her if she wanted to shower or cleanup, but she did not take a bath during the entire time she was there.

While he was on the stand, the defendant was also asked several questions by the court that had been relayed by the jury. In response, the defendant testified that: (1) the victim never asked him to take her home before Wednesday morning, (2) he never refused to take the victim home, (3) he never had sex with the victim on Tuesday, (4) he never threatened to kill the victim or her family, and (5) he saw the victim eat food while she was still at his apartment.

Following this testimony, the defense rested, the parties gave closing arguments, and the jury was instructed by the trial court. The jury retired to deliberate and returned with a verdict of guilty as charged. The defendant filed a timely notice of appeal. We proceed to consider his claims.

## ANALYSIS

The defendant argues that the evidence is insufficient to support his conviction and that the trial court erred by imposing an excessive sentence. For the reasons that follow, we find these claims to be without merit. We affirm the judgments of the trial court accordingly.

## I.

The defendant claims that the evidence is insufficient to support his convictions for aggravated rape and aggravated assault. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). Fact-finding is the province of the jury, not an appellate court. Once a jury has assessed the credibility of the witnesses and resolved any conflicts in the testimony and other evidence presented to it at trial, this court will not re-weigh that evidence or draw any inferences from it contrary to those drawn by the jury. *See id.* On appeal, this court affords the State the strongest legitimate view of the evidence and any reasonable inferences that may be drawn from it. *See id.*

The defendant in this case was convicted of aggravated rape and aggravated

kidnapping. Rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances," some of which are "[f]orce or coercion is used to accomplish the act" or "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a) (2009). "Rape" becomes "aggravated rape" if it is accompanied by any one of several different statutory factors, including "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon" or "[t]he defendant causes bodily injury to the victim." T.C.A. § 39-13-502(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . emission of semen is not required." T.C.A. § 39-13-501(7). "Bodily injury" is defined as including "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). In sum, given the context of this case, in order to support all the essential elements of aggravated rape, there must have been evidence sufficient for a reasonable jury to find beyond a reasonable doubt that: (1) sexual penetration occurred between the defendant and the victim; (2) either force was used to accomplish the penetration or the victim did not consent to the penetration and the defendant knew or should have know that the victim did not consent; and (3) the defendant was armed with a weapon when he used force to accomplish the penetration or the victim did not consent and the defendant cut, bruised, caused physical pain or otherwise injured the victim.

Evidence sufficient to support the jury's conclusion with respect each of these elements is contained in the record. The victim testified that the defendant attacked her and forced intercourse on her both over her resistance and against her will, notwithstanding her repeated pleas that she did not want to have sex. The victim testified that she was repeatedly beaten by the defendant during the assault and that she was injured as a result. The victim's testimony concerning her injuries was supported by numerous photographs presented at trial as well as by the testimony of law enforcement officers and medical personnel who treated her after the attack.

Kidnapping is a form of false imprisonment. "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty. T.C.A. § 39-13-302(a). "Aggravated kidnapping is false imprisonment" that is accompanied by any of several aggravating factors, including if "the victim suffers bodily injury" or if the defendant's purpose in committing the false imprisonment is "[t]o facilitate the commission of any felony or flight thereafter." T.C.A.

§ 39-13-304(a).  Given the context of this case, in order to support all of the essential elements of aggravated kidnapping, there must have been evidence sufficient for a reasonable jury to find beyond a reasonable doubt that: (1) the defendant confined the victim in a manner that substantially interfered with her liberty and (2) the victim was injured or the defendant confined the victim in order to facilitate the commission of a rape.

Evidence sufficient to support the jury's conclusion with respect each of these elements is contained in the record.  The State presented considerable evidence at trial the defendant confined the victim at his residence for a period of nearly four days against her will.  In addition to the victim's direct testimony on the subject, her testimony on these issues was supported by considerable circumstantial evidence, including the victim's friend's testimony concerning the unusual length of time that she was gone, her unusual behavior during conversations that they had with her on the phone, and the fear and anxiety that she exhibited immediately upon being returned home.

With respect to the remaining elements of aggravated kidnapping, the State presented sufficient evidence to support the jury's finding that the victim was injured during her period of confinement for the reasons we have previously summarized.  The jury could also reasonably infer, based on the victim's testimony and that of other witnesses at trial, that the purpose of this confinement was to facilitate the rape and to prevent the victim from reporting it afterward.

Thus, evidence sufficient to uphold both of the defendant's convictions is contained in the record.  The defendant's argument to the contrary on appeal consists largely of directing our attention to evidence that casts doubt upon the veracity of the victim's testimony.  The defendant points out that: (1) the victim did not report being raped or kidnapped to any of the various individuals that she spoke to on the telephone while she was at the defendant's apartment; (2) the victim did not leave the apartment during any of the time periods when, according to the testimony of the defendant and other witnesses, the defendant was gone from the apartment; and (3) she did not report the rape or kidnapping to anyone until the Wednesday after the assault.  All of these arguments relate only to the weight of the evidence against the defendant, and this court does not re-weigh the evidence on appeal. *See, e.g., Campbell*, 245 S.W.3d at 335.  The jury had ample opportunity to assess the victim's credibility, and it is the duty of an appellate court to respect the jury's decision on such matters. *See, e.g., Wagner*, 382 S.W.3d at 297.  The defendant's claim that the evidence is insufficient to support his convictions is denied.

**II.**

The defendant claims that the trial court erred by imposing an excessive sentence upon him. After reviewing the record, we cannot agree. Both the defendant's twenty-five year sentence for aggravated rape and his ten-year sentence for aggravated kidnapping fall within the applicable sentencing ranges in light of the defendant's offender status and offense grades. A trial court's in-range sentencing decisions are entitled to a presumption of reasonableness and are reviewed under an abuse of discretion standard. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Consequently, we begin with the presumption that the defendant's effective sentence of thirty-five years is reasonable.

The defendant has presented nothing to this court that would rebut this presumption. The defendant merely argues that the trial court misapplied a statutory enhancement factor (specifically, that the trial court erred by finding that the defendant had a previous history of criminal behavior based solely upon his prior misdemeanor driving offenses) and that the trial court erroneously found that the defendant was a dangerous offender who qualified for consecutive sentencing. Even if this court were inclined to agree with the defendant's assertions—which it is not—we would still lack any grounds for reversing the defendant's sentence. The law is now well-settled that a trial court's mere misapplication of enhancing or mitigating factors provides no basis for the reversal of a defendant's sentence. *See, e.g, Bise*, 380 S.W.3d at 709. Instead, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles" of sentencing. *Id.* at 709-10.

The defendant in this case stands convicted of kidnapping, raping, and generally terrorizing the victim over a period of four days. Several expert witnesses in this case, each of whom who had considerable experience with investigating rapes and/or treating rape victims, testified that the injuries suffered by the victim were among the worst that they had witnessed. Several photographs contained in the record amply support this testimony. That the defendant had only a modest criminal record prior to committing these horrific crimes does not serve to meaningfully reduce his culpability or reduce the obvious danger that he poses to society.

The defendant's thirty-five year effective sentence fully comports with all relevant statutory principles and purposes of sentencing. The defendant's claim that the trial court erred by imposing an excessive sentence is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE