# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 23, 2012 Session Heard at Cookeville[1]

## STATE OF TENNESSEE  v. CARL J. WAGNER

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2009-A-305      Steve Dozier, Judge**

---

**No. M2010-00992-SC-R11-CD - Filed October 12, 2012**

---

We granted the State's application for permission to appeal to determine whether the Court of Criminal Appeals erred by finding the evidence insufficient to support the defendant's convictions of especially aggravated robbery and felony murder. Affording the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence, we conclude that the evidence is sufficient to support the defendant's convictions. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the judgment of the trial court.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Judgment of the Trial Court Reinstated**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., AND JANICE M. HOLDER, WILLIAM C. KOCH, JR., AND SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Jeffrey D. Zentner, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; J. Wesley King, Assistant District Attorney General; and Pamela Anderson, Assistant District Attorney General, Nashville, Tennessee, for the appellant, State of Tennessee.

Michael A. Colavecchio, Nashville, Tennessee, for the appellee, Carl J. Wagner.

---

[1] Oral argument was presented at Derryberry Hall on the campus of Tennessee Technological University in Cookeville, Putnam County, Tennessee, as a part of the Boys State Supreme Court Advancing Legal Education for Students (S.C.A.L.E.S.) project.

# OPINION

## I. Factual Background

On August 27, 2008, Carl J. Wagner, the defendant, shot nineteen-year-old Adriel Charles Powell in the laundry room of a Nashville apartment complex located at 1601 Herman Street. The State charged the defendant with premeditated first degree murder, first degree murder committed in the perpetration of, or attempt to perpetrate, robbery, and especially aggravated robbery. The prosecution's theory at trial was that the shooting occurred during a drug deal as the defendant robbed the victim of a backpack containing narcotics.

Officer William McKay of the Metropolitan Nashville Police Department ("Metro") arrived at the scene of the shooting shortly after a 3:25 p.m. report of "shots fired." Four bystanders in an outdoor courtyard told Officer McKay of a "dead person in the laundry room." Another bystander told Officer McKay of "a guy [inside the laundry room] with his brains out." As he approached the laundry room, Officer McKay noticed a bullet hole in the shattered window next to the door. Because the door was closed and locked, Officer McKay did not enter the laundry room, but he saw the victim, whom he described as obviously dead, lying on the floor just inside the door. After securing the scene, Officer McKay called for homicide detectives and remained at the scene until other officers arrived.

Metro Detective Michael Moss was on his way to the scene of the shooting when he was redirected to the emergency room of Vanderbilt Children's Hospital to investigate a report of a person with gunshot wounds, later identified as the defendant. When he arrived, Detective Moss spoke briefly with Thalis Smith, who had driven the defendant to the hospital and assisted him into the emergency room. Detective Moss then interviewed the defendant who said that he had been standing in a grassy area of the apartment complex when he heard gunshots and fled. Realizing that he had been shot, the defendant ran to Mr. Smith, who helped him into a vehicle and drove him to the hospital. According to Detective Moss, the defendant said he knew Mr. Smith prior to the shooting and described Mr. Smith as "my boy," but the defendant denied any involvement in or knowledge of the shooting.

Before he left the hospital, Detective Moss collected several items from the defendant's belongings, including money totaling $51.25, a holster, Nike tennis shoes, clothing, a lighter, and a bag of "green plant material," which scientific testing later identified as marijuana.

Detective Moss also arranged for Mr. Smith to return to the scene of the shooting, where Metro Detective James Capps, the lead detective on the case, interviewed him.

According to Detective Capps, Mr. Smith was "very anxious" during the interview and repeatedly denied any knowledge of the shooting. Mr. Smith said he "didn't want to be there" and just happened to be standing on the street smoking a cigarette when the defendant ran up and asked for help. Seeing the defendant had been shot, Mr. Smith drove him to the hospital. Mr. Smith said nothing about knowing the defendant prior to the shooting.

As detectives conducted interviews, Metro Sergeant Danny Orr and Metro Crime Scene Investigator Felicia Evans collected evidence and prepared detailed diagrams documenting the location of the evidence found in the laundry room, the outdoor courtyard, and the parking lot of the apartment complex. Investigator Evans swabbed thirteen distinct "reddish-brown stains" at the scene, which DNA analysis later confirmed were bloodstains. The first bloodstain, found on a vehicle in the parking lot, the second and third bloodstains, found on the ground near the vehicle, a fourth bloodstain, found on top of the shattered window glass in front of the laundry room door, and a fifth bloodstain, found on the interior of the laundry room door, all matched the defendant's DNA. A sixth bloodstain, found on the interior laundry room door frame, a seventh bloodstain, found on the interior wall of the laundry room, and an eighth bloodstain, found on the circular metal plate surrounding the interior laundry room door knob, all matched the victim's DNA.

Five other bloodstains, numbered nine through thirteen at trial, were found on the railing next to the walkway outside the laundry room. The bloodstains numbered nine through twelve at trial matched the defendant's DNA and were drop-pattern stains. The bloodstain numbered thirteen at trial matched the victim's DNA and was described as a transfer pattern stain, meaning the blood had been transferred from fabric onto the railing.

Investigators also recovered a pair of Nike flip flops outside the laundry room—finding one sandal on the courtyard walkway and the other in the parking lot near the vehicle where the defendant's blood had been found.

Additionally, investigators found three nine-millimeter cartridge casings in the courtyard—two on the walkway and one in the bushes in front of the laundry room. Investigators also recovered a nine-millimeter magazine with six unspent Winchester cartridges next to the walkway in the courtyard. A copper bullet jacket fragment was found outside as well, near the shattered glass of the shot-out window.

Inside the laundry room, next to the victim's body, investigators found two Federal .45 caliber cartridge casings. A baseball cap located near the victim's body was marked by a bullet hole, and beneath the cap investigators found an intact .45 caliber bullet and a lead fragment, likely from a bullet but lacking exterior identifying characteristics. Investigators also recovered bullet fragments from the wooden laundry room door frame.

Special Agent Steve Scott of the Tennessee Bureau of Investigation ("TBI") examined the ballistics evidence and testified that the two .45 caliber cartridge casings and the intact bullet found beneath the cap were fired from the same .45 caliber weapon. Agent Scott determined that the bullet, bullet jacket, and bullet fragment recovered from the victim's body also had been fired from the same .45 caliber weapon.

Agent Scott testified that the three nine-millimeter cartridge casings were fired from the same nine-millimeter weapon. With respect to the nine-millimeter magazine found outside the laundry room, Agent Scott opined that it was designed for use with a Smith and Wesson nine-millimeter semi-automatic pistol of the Sigma series. Agent Scott further opined that the copper bullet jacket fragment and the bullet fragments recovered from the laundry room door frame had rifling consistent with that type of Smith and Wesson handgun.

Despite the lack of exterior identifying characteristics, Agent Scott testified that the fragment found beneath the cap was a copper-washed lead fragment "that is almost exclusively seen in twenty-two caliber ammunition." According to Agent Scott, the bullet that passed through the window next to the laundry room door had been fired toward the courtyard from a gun inside the laundry room, while the bullet recovered from the laundry room door frame had been fired toward the laundry room from a gun in the courtyard.

At approximately 7:25 p.m. on the day of the shooting, Mr. Smith, the victim, and the defendant were tested for gunshot residue. TBI Special Agent Laura Hodge testified that Mr. Smith tested negative; the victim tested positive; and the defendant tested inconclusive. Agent Hodge explained that gunshot residue consists of antimony, barium, and lead, and that an inconclusive test result indicates the presence of one or more of those elements, but in concentrations not consistent with gunshot residue. Because gunshot residue is "very fragile evidence," deposited "just on the surface of an individual's hands" and can be easily rubbed off or washed away, an inconclusive result does not rule out the possibility that the person tested fired a gun. According to Agent Hodge, the likelihood of finding gunshot residue is greater if the testing occurs soon after the firing, and she also explained that semi-automatic handguns discharge gunshot residue down range, away from the shooter, leaving less residue than other handguns.

The day after the shooting, August 28, 2008, Detective Capps interviewed the defendant at Vanderbilt Hospital, where he remained for treatment of his injuries.[2] The jury heard an audio recording of the interview, and the State also introduced a transcript of the

_____

[2] The defendant was transferred from the emergency room of Vanderbilt Children's Hospital and admitted to Vanderbilt Hospital where he remained hospitalized for two days for treatment of the gunshot wounds to his left upper arm and upper abdomen.

interview as an exhibit. The defendant initially denied any involvement in the shooting, telling Detective Capps that he lived in Clarksville and had been at the Herman Street apartments visiting a female friend, "Rita," and was shot while standing in the courtyard outside the laundry room. However, as the interview progressed, the defendant changed his story. While he initially claimed that he used the holster found among his belongings to store coins and other items, the defendant eventually admitted that he had carried a .45 caliber semi-automatic handgun in the holster on the day of the shooting. The defendant said he purchased the weapon some years earlier at "Grandpa's," a gun shop in Clarksville. The defendant admitted that he frequently smoked marijuana, explaining that he had "picked up the habit like bad" while serving in the military.[3] The defendant claimed that he had bought expensive, premium-quality marijuana in Clarksville and had brought it with him to Nashville on the day of the shooting, but he had been reluctant to share it with Mr. Smith, who came with him to Nashville, or Rita. When he learned from Rita that he could buy drugs at the laundry room, he went there with approximately forty dollars, intending to buy less-expensive marijuana to share with his friends.

The defendant said he met the victim and a second man outside the laundry room. According to the defendant, the victim was carrying "a bag on his back,"[4] and the defendant believed the bag contained drugs. After opening the locked laundry room door with a key, the victim entered, followed by the defendant, who was followed by the second man. The victim walked into a separate room near the back of the laundry room with the backpack, while the defendant and the second man remained near the door—the only means of entering and exiting the laundry room. The defendant sat on a "ledge" to the right of the door, while the second man stood nearby. They had waited only a few minutes when, according to the defendant, the second man suddenly began shooting at him and then ran out the door into the courtyard. The second man continued shooting, and the defendant fired back, shooting through the window next to the door at least once.

When the shooting began, the defendant saw the victim run from the room at the rear of the laundry room toward the door. As the victim approached the door, the defendant shot him, but the victim continued toward the door, so the defendant shot the victim a second time. The victim then fell to the floor in front of the door, and the defendant fled the scene, losing his Nike flip flops as he ran.

---

[3] According to the pre-sentence report in the record, the defendant served in the military from October 1, 2003 to June 4, 2008.

[4] Like the Court of Criminal Appeals, we will use the term "backpack" to refer to the victim's bag.

Although the defendant could not recall seeing the victim with a gun and said the victim did not threaten him, the defendant said he shot the victim because he feared the victim would shoot him. The defendant saw the second man run away from the courtyard, but the defendant did not know whether the second man had been shot  The defendant repeatedly said the victim had a backpack. The defendant was not asked directly whether he took the victim's backpack.[5]  When asked whether he and the victim had a physical altercation that would explain the victim's torn shirt, the defendant denied touching the victim and said he fled the scene immediately after shooting the victim, stating on one occasion that he fled the scene before the victim fell to the floor. The defendant also denied purchasing or stealing marijuana from the victim and explained that the marijuana found among his belongings had been purchased in Clarksville before he came to Nashville. The defendant said that he was "just trying to get some weed," but the second man "was trying to kill [him]."  Although the defendant remembered Rita, Mr. Smith, and another man driving him to the hospital and also recalled the two men physically carrying him into the emergency room, he could not remember where he dropped the gun used in the shooting. He suggested that Mr. Smith could possibly locate the gun, however.

Detective Capps testified that investigators were unable to locate anyone other than the defendant willing to admit to firsthand knowledge of the shooting. Rita refused to cooperate in the investigation, and the police were unable to locate Mr. Smith, despite searching for him in the vicinity of both Clarksville, Tennessee, and Oak Grove, Kentucky.

Still photographs obtained from video surveillance at Vanderbilt Children's Hospital confirmed the defendant's statement that Mr. Smith and another man, whom investigators were never able to identify, physically carried the defendant into the emergency room.

Investigators recovered neither the gun the defendant used in the shooting nor the victim's backpack containing drugs. However, investigators confirmed the defendant's statement that the defendant was the registered owner of a .45 caliber semi-automatic handgun that he had purchased from "Grandpa's" gun shop in Clarksville.

Dr. Bruce Levy, Chief Medical Examiner for the State of Tennessee and Medical Examiner for Davidson County, performed the victim's autopsy on August 28, 2008. Dr. Levy ruled the victim's death a homicide caused by at least two gunshots. Dr. Levy opined that a single bullet likely entered the left side of the victim's neck, exited on the right side, re-entered the victim's shoulder, and exited the top part of his right arm. Dr. Levy opined

---

[5] The Court of Criminal Appeals' statement that the defendant told the police that he grabbed the victim's backpack as he fled the laundry room, State v. Wagner, No. M2010-00992-CCA-R3-CD, 2011 WL 2893098, at *5 (Tenn. Crim. App. July 20, 2011), is not supported by the record.

that these wounds did not penetrate the victim's spinal cord or impact any significant blood vessels. However, Dr. Levy said the other bullet that entered the left side of the victim's head would have produced "immediate unconsciousness rapidly progressing to death . . . within a m[a]tter of . . . a few minutes at most."

The State introduced photographs showing the position of the victim's body, blood smears on the victim's hands and arms and on the floor nearby, and the victim's torn shirt, which had been ripped at the shoulder area.

Following a Momon[6] colloquy, the defendant elected not to testify and rested without presenting any evidence.

During closing argument, the State argued that the defendant went to the laundry room intending to rob the victim of drugs. The State also suggested that a fourth man, likely Mr. Smith, had been involved in the shooting and the robbery. The State contended that the defendant shot and killed the victim, removed the victim's backpack containing drugs, and had been on his way out the door when he was shot, probably by an associate or friend of the victim. Based on the photographs of the scene, the State argued that the position of the victim's body, tears in the victim's shirt, and blood smears on the victim's arms and hands and the floor near his body, proved that the victim's body had been moved and his backpack taken after the shooting. As for proof showing that the defendant removed the backpack containing drugs, the State pointed to the victim's blood on the courtyard railing along the path by which the defendant fled the scene, its proximity to the drop-pattern stains of the defendant's blood, and the expert testimony indicating that the victim's blood had been transferred to the railing from fabric. The State argued that this evidence, while largely circumstantial, established beyond a reasonable doubt that the defendant had taken the backpack containing drugs from the victim's person after the shooting and transferred the victim's blood from the backpack to the railing as he fled.

Based on the evidence, the jury convicted the defendant of first degree murder committed in the perpetration of, or attempt to perpetrate, robbery ("felony murder"). The jury also convicted the defendant of especially aggravated robbery and second degree murder—a lesser-included offense of the charge of premeditated first degree murder. The trial court merged the second degree murder conviction with the felony murder conviction

---

[6] See Momon v. State, 18 S.W.3d 152 (Tenn. 1999).

and imposed a life sentence by operation of law for the felony murder conviction[7] and a twenty-two year concurrent sentence for the especially aggravated robbery conviction.[8]

The defendant raised a single issue on appeal—the sufficiency of the evidence to support his convictions. Specifically, the defendant argued that the proof showed he acted in self-defense, or alternatively, that he and the victim had been engaged in mutual combat at the time of the shooting. The defendant argued that he should have either been acquitted or convicted of the lesser-included offense of voluntary manslaughter.

The Court of Criminal Appeals listed the defendant's arguments, but "perceive[d] a greater issue concerning the sufficiency of the evidence . . . in that the defendant's confession alone provides the only evidence that a backpack was taken from the victim." Wagner, 2011 WL 2893098, at *5. The Court of Criminal Appeals recited the rule that "a conviction cannot be based solely on a defendant's confession." Id. (internal quotation marks omitted). After finding "no evidence" corroborating the defendant's confession "concerning the existence of the backpack or its taking," the Court of Criminal Appeals held the evidence insufficient to support the defendant's conviction of especially aggravated robbery. Id. Because it found the proof of especially aggravated robbery insufficient, the Court of Criminal Appeals stated that the evidence was "ipso facto" insufficient to support the defendant's conviction of felony murder. Id. However, the Court of Criminal Appeals found the evidence sufficient to support the defendant's conviction of second degree murder and remanded to the trial court for re-sentencing on that conviction. Id. at *6.

We granted the State's application for permission to appeal.

## II. Analysis

### A. Standard of Review

Appellate courts evaluating the sufficiency of the convicting evidence must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the

---

[7] See Tenn. Code Ann. § 39-13-208(c) (2010).

[8] Despite merging the second degree murder conviction with the felony murder conviction, the trial court also imposed a twenty-two year concurrent sentence on the second degree murder conviction.

conviction. State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011). This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury. Bland, 958 S.W.2d at 659. Circumstantial and direct evidence are reviewed under the same standard of review. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. Id. at 381.

### B. Sufficiency of the Evidence - Especially Aggravated Robbery

"Especially aggravated robbery is robbery . . . (1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2010).

The crux of the Court of Criminal Appeals' holding that the evidence is insufficient to support the defendant's conviction of especially aggravated robbery is its statement that "no evidence corroborates the defendant's confession concerning the existence of the [victim's] backpack or its taking [from the victim]." Wagner, 2011 WL 2893098, at *5. As the Court of Criminal Appeals correctly pointed out, a criminal conviction cannot be based *solely* on a defendant's uncorroborated confession.[9] See State v. Banks, 271 S.W.3d 90, 140 (Tenn. 2008); State v. Housler, 193 S.W.3d 476, 490 (Tenn. 2006); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000); Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911); Williams v. State, 80 Tenn. 211, 212-13 (1883). However, this rule does not entitle the defendant to relief because, contrary to the Court of Criminal Appeals' statement, the defendant's

---

[9] This rule requiring corroboration of a confession is known as the *corpus delicti* rule. United States v. Brown, 617 F.3d 857, 860 (6th Cir. 2010). In this appeal, the State has not asked us to abrogate or modify the *corpus delicti* rule. Another pending appeal presents the questions of whether the *corpus delicti* rule should be abrogated or modified. State v. Bishop, No. W2010-01207-SC-R11-CD (Tenn. Aug. 15, 2012) (order granting Tennessee Rule of Appellate Procedure 11 application and requesting additional briefing on the *corpus delicti* rule).

confession is not the only evidence the prosecution relied upon to establish the existence or taking of the victim's backpack.

In fact, the prosecution relied upon circumstantial evidence independent of the defendant's statement to establish that the victim's backpack containing drugs was stolen after the shooting. In particular, the prosecution introduced photographs showing the position of the victim's body, the tearing of the shoulder-area of the victim's shirt, and blood smears on the victim's hands and arms as well as on the floor near his body. This circumstantial proof, along with the defendant's statement, is sufficient to support the jury's finding that the victim had a backpack that someone removed from the victim's body after the shooting.

Furthermore, to prove that the *defendant* removed the victim's backpack containing drugs and fled the scene with it, the prosecution introduced evidence showing that the victim's blood had been transferred from fabric to the walkway railing outside the laundry room. The medical examiner testified that the nature of the victim's injuries eliminated the possibility that the victim left the laundry room after the shooting and transferred his own blood to the railing. The prosecution also showed that the victim's blood on the railing was near the drop-pattern stains of the defendant's blood and along the path the defendant said he fled after the shooting. No proof was offered to show that the victim's blood was on the defendant's clothing. The first officer at the scene of the shooting testified that the laundry room door had been locked when he arrived. This testimony supported the prosecution's theory that the victim's blood had been transferred to the railing by the perpetrator of the crime.

As further proof that the defendant stole the victim's backpack containing drugs, the prosecution relied upon the defendant's admission that he frequently smoked marijuana, the defendant's statement that he went to the laundry room to buy drugs from the victim, the defendant's statement that the victim's backpack contained drugs, the absence of drugs from the victim's person and the laundry room after the shooting, and the marijuana found among the defendant's belongings at the hospital shortly after the shooting. This proof supported the prosecution's theory that the defendant removed the victim's backpack containing drugs after the shooting.

Although the prosecution relied entirely on circumstantial evidence to prove that the defendant removed the victim's backpack containing drugs, circumstantial evidence alone is sufficient to support a conviction and need not exclude every reasonable hypothesis except that of guilt. Dorantes, 331 S.W.3d at 380-81. Although the defendant claimed that he purchased the marijuana found among his belongings in Clarksville prior to the shooting, the jury implicitly rejected this alternative explanation, as was its prerogative. This Court neither

re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. Bland, 958 S.W.2d at 659. Thus, we conclude that a rational trier of fact could have found that the defendant intentionally or knowingly removed the victim's backpack containing drugs without the victim's effective consent.[10]

The evidence is also sufficient to support the jury's findings of the violence, use of a deadly weapon, and serious bodily injury elements of especially aggravated robbery. A firearm[11] is by definition a deadly weapon,[12] and the defendant admitted shooting the victim twice with a .45 caliber semi-automatic pistol. The medical examiner confirmed that the victim had been shot at least twice with a .45 caliber weapon. The medical examiner also described the victim's serious bodily injuries,[13] stating that one of the wounds caused almost immediate death, while the other bullet caused injuries to the victim's neck, shoulder, and arm. Viewed in the light most favorable to the prosecution, the evidence sufficiently supports the jury's verdict finding the defendant guilty of especially aggravated robbery.

---

[10] We note that during closing argument defense counsel agreed that the prosecution had introduced sufficient proof to show that the defendant took the victim's backpack containing drugs, although defense counsel maintained that the evidence failed to show that the defendant did so intentionally or knowingly. For example, defense counsel stated:"[The defendant] did not have the intent to rob until after he shot Mr. Powell in self-defense and pick[ed] up the backpack. That's misdemeanor theft . . . ." Defense counsel also stated: "But, after [the victim] was shot in the head, my client pick[ed] up his twenty-two revolver and backpack. That's just . . . I mean, you've got to believe that, right? Cause the blood there is outside and there's [the victim's] blood outside, and I don't know if there is any other way to look at it." Additionally, in the brief filed in the Court of Criminal Appeals, defense counsel argued that the defendant "defended himself and subsequently, while bleeding profusely and certainly in a state of shock, took the backpack instinctively." Of course, as the trial court here properly instructed the jury, argument and statements of counsel are not evidence and should be disregarded if not supported by the evidence. See, e.g., Banks, 271 S.W.3d at 137. Defense counsel's statements concerning the defendant taking the victim's backpack are supported by the proof introduced at trial. Unlike defense counsel, we also conclude that the proof is sufficient to support the jury's finding that the defendant intentionally or knowingly took the victim's backpack containing drugs.

[11] "'Firearm' means any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use[.]" Tenn. Code Ann. § 39-11-106(a)(11) (2010).

[12] "'Deadly weapon' means [a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(A) (2010).

[13] See Tenn. Code Ann. § 39-11-106(a)(34) (defining "serious bodily injury"); State v. Farmer, No. W2009-02281-SC-R11-CD, 2012 WL 3594242, at *4 (Tenn. Aug. 22, 2012) (discussing "serious bodily injury" as used in section 39-11-106(a)(34)).

-11-

## C. Sufficiency of the Evidence - Felony Murder

The evidence is also sufficient to support the jury's verdict finding the defendant guilty of felony murder. As relevant to this appeal, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . robbery." Tenn. Code Ann. §39-13-202(a)(2) (2010). The culpable mental state required for conviction is the intent to commit the underlying felony, in this case, robbery or attempted robbery, not the intent to commit murder. Tenn. Code Ann. § 39-13-202(b). A killing that precedes, coincides with, or follows the commission of an underlying felony will be considered "in the perpetration of" the underlying felony, so long as there is a connection in time, place, and continuity of action. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000); State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Determining whether a defendant intended to commit the underlying felony, and at what point the intent existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107.

Viewed in the light most favorable to the prosecution, the proof established that the defendant and a friend traveled to Nashville from Clarksville to obtain drugs at the Herman Street apartment complex. The defendant armed himself with a weapon before leaving Clarksville, although, according to his own statement, he ordinarily did not carry a gun. The defendant admitted entering the laundry room with the victim and said the victim had a backpack containing drugs. The defendant also admitted shooting the victim more than once with the weapon he brought to the drug buy, and the prosecution's proof fully corroborates this admission. Although the defendant claimed that he shot the victim in self-defense, the defendant admitted shooting the victim as the victim ran toward the door of the laundry room, and the defendant conceded that the victim did not threaten him and that he did not see the victim with a gun. As was its prerogative, the jury rejected the defendant's claim of self-defense and accredited the prosecution's theory and proof that the defendant shot the victim during the perpetration of, or attempt to perpetrate, robbery. Again, this Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury. Bland, 958 S.W.2d at 659. The defendant's challenge to the sufficiency of the evidence is without merit.

-12-

### III. Conclusion

Viewed in the light most favorable to the prosecution, the evidence is sufficient to support the defendant's convictions of especially aggravated robbery and felony murder. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the judgment of the trial court. It appearing the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE