IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs June 27, 2017

## STATE OF TENNESSEE v. DAVID HOPKINS

**Appeal from the Criminal Court for Knox County**
**No. 101102   Steven W. Sword, Judge**

_____

### No. E2016-02192-CCA-R3-CD

_____

The Defendant-Appellant, David Hopkins, appeals his conviction for first degree felony murder, arguing that the evidence is insufficient to sustain his conviction and that the trial court abused its discretion in ordering consecutive sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, David Hopkins.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Charme P. Allen, District Attorney General; and Philip H. Morton and Steven C. Garrett, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged Hopkins with one count of first degree felony murder and two counts of especially aggravated robbery. Prior to trial, the especially aggravated robbery counts were dismissed on the ground that they were barred by the statute of limitations. A jury trial on the first degree felony murder charge took place in June 2014.

The State's evidence at trial established that Tony Barrett, the victim, lived two houses down from Hopkins' mother in Knoxville and regularly sold marijuana from his home. Prior to the July 11, 1994 incident, Hopkins had stolen drugs from the victim on several occasions. At some point, the victim had shown Hopkins a produce truck full of

marijuana and had said that because Hopkins "was a liar and a piece of this, that . . . he couldn't have no part of none of this." At the time of the victim's death, Hopkins was aware that the victim was having a sexual relationship with Hopkins' estranged wife, Kimberly Sutton.[1]

Kimberly Sutton stated that on July 11, 1994, Hopkins and his friend, David Riggs, appeared at the victim's house, where she was helping the victim "bag[] up some weed." When Sutton and the victim observed Hopkins and Riggs approaching the house, they put the marijuana away. Sutton then went into the back bedroom to keep Hopkins and the victim from fighting and did not hear much noise coming from the front of the house for a long period of time. When she finally exited the bedroom, Sutton saw Hopkins holding a baseball bat and standing over the victim's body. She also saw Riggs standing beside Hopkins. Sutton said Hopkins, who claimed he would never hurt her, told her, "You won't say nothing." Then Hopkins and Riggs searched the victim's house, finding money and approximately ten pounds of marijuana. Sutton said Riggs took the marijuana, but she "didn't see who had the money." When questioned further on this issue, Sutton stated, "I can't say [Hopkins] had the money. I don't know." Sutton placed a cloth over the victim's face before leaving the home with Hopkins and Riggs.

On the evening of July 11, 1994, the victim's sister, Sherry Shoopman, and her husband arrived at the victim's home and discovered the victim's dead body. Shoopman stated that the victim, at the time of his death, had approximately $1000 in cash in his home because he had just been paid. After finding the body, Shoopman called 9-1-1, and Detective Ed Stair with the Knoxville Police Department responded to the scene.

Upon his arrival, Detective Stair observed that the victim, whose face was covered with a cloth napkin, was lying on his back in a pool of blood in the dining room with his shorts pulled down to his knees. One of the victim's pockets had been pulled out as if someone were looking for something, and there was blood spatter from the floor to the wall, which suggested that the perpetrator had hit the victim as the victim was lying on the floor.

Detective Stair also noted that the victim's home had been ransacked. He said ceiling tiles had been pushed up and drawers in the kitchen and bedroom had been opened, which indicated that the perpetrator had been "looking for something." Detective Stair also found a metal baseball bat covered in blood lying under a pile of clothes in the bedroom and determined that this bat was the murder weapon. The coroner

---

[1] Although this individual is also identified in portions of the transcript as "Kimberly Sutton Hopkins" or "Kimberly Hopkins," we will identify her as "Kimberly Sutton" to avoid confusion.

and Detective Stair removed the cloth napkin from the victim's face and saw that the victim, who had a sock gag in his mouth, had received several blows to back of the head.

Upon examination, Detective Stair discovered a small amount of marijuana and drug paraphernalia in the victim's home. He later learned that the victim, just prior to his death, had possessed a substantial amount of marijuana and approximately $1500 in cash. Based on this evidence, Detective Stair surmised that the perpetrator's motive in committing the offense was to obtain the victim's money and drugs.

Detective Stair said that he interviewed twelve to fifteen individuals during his investigation into the victim's death, including Hopkins' wife, Kimberly Sutton. However, when Sutton recanted her statement implicating Hopkins in the victim's killing, the district attorney's office dismissed Hopkins' arrest warrant for murder, and the case was considered an unsolved or "cold" case. Detective Stair said he did not recall discussing the nature of the victim's injuries with anyone he interviewed in the case. He asserted that the details regarding the cloth over the victim's face, the gag in the victim's mouth, the number of wounds, and the murder weapon were never released to the media.

Dr. Darinka Miluesnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties, reviewed the victim's autopsy and determined that the victim's airway had been blocked with a sock gag and that the victim had sustained four blows to the back of his head with a blunt object. These four blows fractured the victim's skull, which caused his brain to tear. Dr. Miluesnic-Polchan noted that bruising on the side of the victim's head indicated that he had been lying against a hard surface, most likely face down on the floor, when he received these blows. She also observed that the victim had suffered blow-out fractures to the orbital area of his face, which caused his eyes to bulge from their sockets. Dr. Miluesnic-Polchan opined that the blows sustained by the victim did not result in his immediate death; instead, she believed that the victim died when his brain swelled from these blows and blood collected in his airway. She added that during the time it took the victim to die, he was probably gasping for air.

Following the victim's killing, Sutton was interviewed by the police on multiple occasions, and her version of the events changed several times. In January 1995, Sutton implicated Hopkins in the victim's death. However, she later recanted her statement at Hopkins' insistence, and the victim's killing remained unsolved. Sutton said that after she was charged with an unrelated murder in Kentucky, she told Detective Day the truth about Hopkins being responsible for the victim's death. She said she finally told the truth about the victim's death because her situation "couldn't get no worse[,]" given that she was charged with first degree murder in the unrelated Kentucky case and was "already looking at life in the penitentiary." She said she also told the truth because "the [victim's] family needed to rest." Sutton acknowledged that after disclosing what she

knew about the victim's case to Detective Day, she entered a guilty plea to facilitation of murder in the Kentucky case. Sutton admitted that she had prior convictions for custodial interference, theft, and forgery, and was currently serving a sentence for her Kentucky conviction for facilitation of murder. When asked about the day of the victim's death, Sutton denied taking a car ride with Hopkins, Andy Bailey, or Misty Humphrey.

Barry Roark, a federal inmate in Illinois, stated that he was Hopkins' cellmate at the Blount County Jail from May 2011 to July 2011. Roark said Hopkins shared so many details with him about the victim's killing that he began keeping a journal to document them. Roark said Hopkins admitted to stealing some items from a neighbor's home the morning of the victim's death. Hopkins said he then went to the victim's home with David Riggs "to get weed," and when they arrived, Riggs put a gun to the victim's head and Kimberly Sutton began screaming. Hopkins said he did not want to use a gun to kill the victim because he believed the police might still be investigating the robbery of the neighbor's home, which was down the street. Instead, Hopkins chose to kill the victim with a baseball bat the victim kept behind his front door. Roark said Hopkins claimed that he hit the victim "so hard in the back of the head that it knocked his eyes out" and that he put a dirty rag over the victim's face. Hopkins also said he stole $150,000 and "a bunch of dope" from the victim before ransacking the home. Roark said Hopkins humorously spoke of the victim's killing, stating he was "glad that fat bastard's dead."

Roark admitted he was currently imprisoned for an armed constructive possession of a firearm conviction. He said that he informed his attorney in May 2011 about what Hopkins had told him about the victim's death. At the time, Roark was facing a federal sentence of 180 to 262 months. In July 2011, he met with his attorney, an assistant United States attorney, and Detective Jeff Day to discuss the things Hopkins had told him. Five days later, Roark signed a cooperation plea agreement and received a sentence of 180 months in his federal case. Roark claimed that his cooperation in this case had no impact on his 180-month sentence and that he had not asked for any relief on this sentence in exchange for testifying against Hopkins at trial. He admitted that his criminal history included two convictions for aggravated assault, two convictions for burglary of a dwelling, two convictions for burglary of a conveyance, one conviction for burglary of a structure, and five or six convictions for grand theft.

Bradley Radcliff said he often gave Hopkins rides in 2011 and 2012. On one occasion, when Radcliff was driving down Western Avenue, Hopkins told him, "I killed a man right up there." When Radcliff refused to believe him, Hopkins said he and his wife had planned to rob the victim and that he had used a baseball bat to kill the victim. Hopkins added, "I beat the f[---] out of him . . . and I didn't stop. I kept hitting him and hitting him and hitting him." Hopkins then showed Radcliff the specific house where this killing occurred.

- 4 -

Radcliff said he did not believe Hopkins' claims about the victim's death until he saw Detective Jeff Day on television discussing the victim's "cold" case. Radcliff called Detective Day, who asked him to take him to the house Hopkins had identified. Radcliff later showed Detective Day the house, which was difficult to see because it was unmarked, had no mailbox, and was on a hill obscured by trees. Regarding Radcliff's identification of the victim's house, Detective Day asserted, "[S]omeone would have [had] to show [Radcliff] where the house was, or there's no way of knowing [that the house existed]." Detective Day also said that Radcliff "was very clear" when pointing out the house that Hopkins had shown him.

Misty Humphrey also talked to the police about the victim's "cold" case. In July 1994, Humphrey rode with Hopkins, Sutton, and Andy Bailey, Humphrey's boyfriend at the time. During this car ride, Humphrey witnessed an argument between Sutton and Hopkins wherein Sutton said, "You didn't have to do that. You didn't have to kill him that way." After Sutton made this statement, Hopkins drove toward Western Avenue, where the victim's home was located, and asked Humphrey and Andy Bailey to see if they observed any police officers or police tape there. Humphrey said Hopkins continued to drive up and down the victim's street until nighttime.

When Humphrey informed her father about Hopkins' strange comments and conduct, her father told her she had not actually seen Hopkins do anything and would be unable to testify against him because she was a teenager. Humphrey explained that because of what her father had told her, she did not initially inform the police about the things she had observed.

Several years later, Humphrey saw a television show about the victim's "cold" case and recognized the victim's house as the same house Hopkins had told her to observe in July 1994. She called the police and spoke to Detective Day, who was assigned to the victim's case. Humphrey later took Detective Day to this house and identified it to him without hesitation.

The defense's proof consisted of testimony from Hopkins, the Defendant-Appellant, Michael Cohan, and Jessie Parton. Hopkins testified that around 9:30 a.m. on the morning of the victim's death, he stole three guns, a video camcorder, and some jewelry from Bob Davies, his mother's neighbor. When Hopkins told his mother what he had done, she told him he had to leave her house, and his sister gave him a ride to Jessie Parton's home on Sutherland Avenue. Shortly thereafter, David Riggs and a girl arrived at Parton's house, and then Hopkins and Parton rode with them to Keith Clarkson's home around 11:30 a.m. After that, the girl dropped off Hopkins, Parton, and Riggs at Riggs's home, where they stayed for a few minutes before going to a trailer park across the street where they were unable to find a buyer for the items Hopkins had stolen from Davies.

They returned to Riggs's home, and another girl gave them a ride to Kelly Donahue and Timmy Stanton's home at Christenberry Heights around 12:30 or 1:00 p.m., and they stayed there until approximately 2:30 p.m. Then Clarkson informed Hopkins that he had found a buyer for the stolen items, and Clarkson picked them up and took them to an area near the West Town Mall, where Hopkins sold the items for $200. Then they returned to Parton's home, where they smoked some marijuana and some of the men lifted weights until slightly after 3:00 p.m. After that, Hopkins, Clarkson, Parton, Riggs and Gene Bailey, who was Andy Bailey's brother, went to Sutton's grandmother's home for fifteen minutes before leaving there at 4:30 p.m. Then Hopkins and Riggs got dropped off at a car lot on Sutherland Avenue. They called Dayvetta Huskey, and they later met her at Sean Raybes's home at the trailer park.

Hopkins admitted he had purchased marijuana from the victim in the past but asserted that he did not buy drugs from the victim on July 11, 1994, because the victim was "on vacation." He acknowledged that he had previously burglarized the victim's home a single time. Hopkins said he was aware that his wife had been having a sexual relationship with the victim; however, he asserted that this relationship did not bother him because they were separated at the time and because his "wife slept with all of [his] friends."

Hopkins denied seeing the victim on July 11, 1994, denied going to the victim's home that day, and denied killing the victim. He claimed that over the years law police officers had questioned him several times about the victim's death and that each time he had learned information about the victim's death. Hopkins also claimed that he had learned some details regarding the victim's killing when he was served with a warrant and accompanying affidavit for his DNA, which occurred prior to his sharing a jail cell with Barry Roark. Hopkins also said he learned details about the crime from news stories, television shows, and the internet, which occurred before he met Roark. Hopkins denied telling Radcliff that he killed the victim, although he admitted identifying the victim's house to him after he saw the television show about the victim's killing.

Hopkins also denied telling Roark that he killed the victim, although he acknowledged telling him details regarding the crime. Hopkins admitted that his criminal history included three convictions for theft, two convictions for aggravated burglary, one conviction for burglary of a business, and one conviction for misdemeanor theft. However, he denied knowing Misty Humphrey.

Michael Cohan, a private investigator, said that the news reports and television coverage about the victim's killing disclosed that the victim was found gagged and beaten to death with a baseball bat and included photographs of the victim's home. Cohan admitted that these reports and coverage had not revealed that a cloth had been

placed over the victim's face, that a sock had been used as a gag, that the victim's house had been ransacked, or that the ceiling tiles had been moved and the stove opened in the victim's home.

Jessie Parton, who had known Hopkins for twenty-five years but had not seen him for the last twelve years, stated that he was with Hopkins between 11:00 a.m. and 5:00 p.m. the day of the victim's death. Parton claimed that when Hopkins got dropped off at his home on July 11, 1994, they went to a trailer park on Sutherland Avenue before going to David Riggs's house, to Bearden to sell the guns and jewelry Hopkins had stolen, and to Christenberry Heights to buy some marijuana. Parton said that at that point, Keith Clarkson picked up Hopkins, Gene Bailey, Riggs and him, and they all went to Kimberly Sutton's grandmother's house before going to Parton's home, where they smoked some marijuana and lifted some weights. Parton said that the last time he saw Hopkins that day was when they dropped Hopkins off at a car wash around 5:00 p.m. He asserted that when he was questioned about the victim's killing, the officers disclosed that the victim had been beaten to death with a baseball bat in his home and that his eyeballs had been "knocked out." Parton denied seeing any blood on Hopkins the day of the victim's death.

Parton acknowledged that he underwent brain surgery in 2012. He stated that while his short-term memory was not very good, his long-term memory was "fairly okay" post-surgery. Parton denied telling Detective Day that he thought Hopkins could have killed the victim; instead, he insisted that he told Detective Day only that Sutton suggested Hopkins could have committed the crime. Parton acknowledged that he was not with Hopkins the entire day of July 11, 1994, and that he did not know what Hopkins had done when he was not in his presence. While Parton was initially unable to recall what he said to Detective Day during the October 6, 2011 interview, which was prior to his brain surgery, Parton later admitted he had not informed Detective Day that he spent a large portion of July 11, 1994, with Hopkins.

In rebuttal, the State presented testimony from Detective Day, who recalled the substance of his October 6, 2011 interview with Parton. Detective Day said that during this interview, Parton failed to provide any valuable information and claimed his "memory was fuzzy" regarding the events of July 11, 1994. Detective Day asserted that Parton never told him Hopkins was with him from 11:00 a.m. to 5:00 p.m. the day of the victim's death and that the first time he had heard these details was during Parton's earlier testimony.

At the conclusion of trial, the jury convicted Hopkins as charged of first degree felony murder. Following a sentencing hearing, the trial court imposed a sentence of life imprisonment and ordered it to be served consecutively to Hopkins' prior federal

sentence. After the trial court denied his timely motion for new trial, Hopkins filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** Hopkins argues that the evidence is insufficient to sustain his conviction for first degree felony murder. Specifically, he claims that the State failed to establish that he formed the intent to rob the victim prior to or concurrently with the killing of the victim. Because a rational jury could have inferred from the evidence presented at trial that Hopkins formed the intent to commit the robbery at the time of the killing, Hopkins is not entitled to relief.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor

substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

First, Hopkins urges this court to disregard Kimberly Sutton's testimony when assessing whether the evidence is sufficient to support his conviction. He contends, citing State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993), that Sutton's testimony implicating him in the victim's killing and robbery is a "nullity" because her contradictory statements cancelled each other. Specifically, he asserts that although Sutton testified she saw Hopkins holding a baseball bat and standing over the victim's body, she admitted on cross-examination that she had given several contradictory statements over the years regarding this incident.

The court in Matthews recognized that "contradictory [sworn] statements by a witness in connection with the same fact cancel each other." 888 S.W.2d at 449 (citing Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476, 482 (Tenn. Crim. App. 1978)); see State v. Cayle Wayne Harris, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at *2 (Tenn. Crim. App. Oct. 12, 2001) ("The rule of cancellation is typically limited to circumstances in which the witness has sworn to each statement."). The Matthews court explained that unlike a scenario in which the jury hears contradictory testimony from two different witnesses and must make a credibility determination, a witness's self-contradicting testimony means that each version carries equal weight and cannot be resolved by the jury except through whimsy. Matthews, 888 S.W.2d at 449-50 (citing Johnston v. Cincinnati N.O. & T.P. Ry. Co., 240 S.W. 429, 436 (Tenn. 1922)). The rule of cancellation applies when "inconsistency in a witness'[s] testimony is unexplained and when neither version of his testimony is corroborated by other evidence." Id. at 450 (citing Taylor, 573 S.W.2d at 483). Testimony from a single witness will be disregarded when the testimony "is not of a cogent and conclusive nature, and 'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon.'" Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. Criminal Law § 903).

We recognize that although Sutton gave unsworn, contradictory statements to the police prior to Hopkins' trial, she provided consistent testimony at trial implicating Hopkins in the victim's killing and robbery. Because Sutton did not provide conflicting sworn testimony, we do not believe the rule of cancellation applies, and we may consider her testimony when evaluating the sufficiency of the evidence. In any case, Sutton, who was subject to rigorous cross-examination on this topic at trial, explained that she gave different statements to police shortly after the crime because Hopkins had pressured her to recant her statement implicating him. Sutton asserted that she was telling the truth about Hopkins' involvement in the killing and robbery because her situation could not get any worse and because the victim's family needed closure. Significantly, Sutton's

testimony identifying Hopkins as a perpetrator was corroborated by the testimony from Barry Roark, Bradley Radcliff, and Misty Humphrey. The jury was able to use Sutton's acknowledgement of her contradictory statements to police in determining her credibility and the weight given to her testimony, and we decline to re-weigh the evidence or to substitute our inferences for those drawn by the trier of fact. See Wagner, 382 S.W.3d at 297. For all these reasons, we decline to disregard Sutton's testimony in evaluating the sufficiency of the evidence in this case.

Hopkins also claims that the testimony from Sutton, Roark, Humphrey, and Radcliff fails to show that he had the intent to rob the victim prior to or concurrently with the killing of the victim. First, he claims that although Sutton testified that David Riggs "had the [victim's] weed," Sutton was unable to state that Hopkins took the victim's money. Next, he asserts that while Roark testified that Hopkins went to the victim's house "to get weed," Roark never testified that Hopkins intended to take the marijuana illegally. Hopkins also insists that Humphrey never testified to any facts supporting a finding that he intended to commit a robbery. Finally, Hopkins claims that although Radcliff testified that Hopkins informed him that he and Sutton "were setting [the victim] up for a burglary," Radcliff admitted he did not know whether Hopkins took anything from the victim's home. As we will explain, there was sufficient evidence establishing that Hopkins had the intent to commit the underlying felony of robbery at the time of the victim's killing.

As relevant in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). The culpable mental state required for a felony murder conviction is the intent to commit the underlying felony, namely robbery in this case. Id. § 39-13-202(b); see Wagner, 382 S.W.3d at 299. Robbery is an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103 (Supp. 1994).

Because Hopkins claims the State failed to establish that he formed the intent to commit the robbery prior to or concurrently with the killing of the victim, we must determine whether the evidence supporting his conviction satisfies the felony murder rule. We note that the felony murder rule applies when the killing is "'done in pursuance of the unlawful act, and not collateral to it.'" State v. Banks, 271 S.W.3d 90, 140 (Tenn. 2008) (quoting Rice, 184 S.W.3d at 663). In other words, "'[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (1956)).

- 10 -

"A killing that precedes, coincides with, or follows the commission of an underlying felony will be considered 'in the perpetration of' the underlying felony, so long as there is a connection in time, place, and continuity of action." Wagner, 382 S.W.3d at 299 (citing State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000); State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). There should also be a causal connection between the killing and the underlying felony. Buggs, 995 S.W.3d at 106 (citing Farmer, 296 S.W.2d at 884; State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring this causal connection supports the deterrent effect of the felony murder rule by excluding killings that are "collateral to and separate from the underlying felony." Pierce, 23 S.W.3d at 296.

In a felony murder case, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Buggs, 995 S.W.2d at 107. "[W]hether a defendant intended to commit the underlying felony, and at what point the intent existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances." Wagner, 382 S.W.3d at 300 (citing Buggs, 995 S.W.2d at 107). As applicable in this case, "a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Buggs, 995 S.W.2d at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The evidence, when viewed in the light most favorable to the prosecution, is sufficient to sustain Hopkins' conviction for first degree felony murder. The proof established that on July 11, 1994, Hopkins planned to rob the victim of drugs and money. On the day of the victim's death, Hopkins was aware that the victim had a substantial amount of marijuana and money because the victim was a known drug dealer. Hopkins had stolen from the victim in the past and had robbed Davies' home the morning of the victim's death. Moreover, Sutton testified that the day of the victim's death she observed Hopkins holding a baseball bat and standing over the victim's body before Hopkins and Riggs searched the victim's house, finding money and approximately ten pounds of marijuana. Later that day, Hopkins drove past the victim's house and asked Humphrey to look for police officers and police tape. Detective Stair, who responded to the crime scene, noted that the victim's home had been ransacked, and a search of the home revealed only a small amount of drugs and no money, despite the fact that the victim was deeply involved in the drug trade. Both Radcliff and Roark testified that Hopkins bragged about robbing and killing the victim after the fact. Given all of this evidence, a rational jury could have reasonably inferred that Hopkins had the intent to commit the robbery prior to, or concurrent with, the killing of the victim, and we conclude that the evidence is sufficient to sustain Hopkins' conviction.

- 11 -

**II. Sentencing.** Hopkins also contends that the trial court abused its discretion in ordering his sentence for life imprisonment served consecutively to his previously imposed federal sentence. He claims that the imposition of consecutive sentencing is excessive because sentences "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). He also maintains that the trial court, when applying the dangerous offender classification, failed to make the required finding that the sentence terms imposed were "'necessary in order to protect the public from further criminal acts by the offender.'" State v. Pollard, 432 S.W.3d 851, 863 (Tenn. 2013) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Hopkins asserts that if the trial court had ordered concurrent sentencing, then he would be eligible for release from his life sentence at age ninety, making the need to protect the public from him unnecessary. Because the trial court did not abuse its discretion in imposing consecutive sentencing, we affirm the sentence in this case.

When a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a); see State v. Hogg, 448 S.W.3d 877, 890 (Tenn. 2014). A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one or more of the criteria in Code section 40-35-115(b) exists. "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." Pollard, 432 S.W.3d at 860.

This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Id. at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), (4); see State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

At the sentencing hearing, Hopkins' presentence report and several victim impact statements were entered into evidence. The presentence report showed that Hopkins' criminal history included three aggravated burglary convictions, one burglary conviction, five felony theft convictions, and one conviction for felon in possession of a firearm.

Scott Barrett, the victim's brother, testified that the victim's murder took a "terrible toll on [his] family" and that his mother had never been the same since the victim died. Hopkins then made an allocution, stating, "I did not kill [the victim]. I'm an innocent man. . . . I'm sorry for your loss, but I did not do that."

During the sentencing hearing, the trial court applied several of the criteria in Code section 40-35-115(b). At the conclusion of the hearing, the trial court, noting that Hopkins had committed "a violent homicide [in] somebody's own home," found that "consecutive sentences . . . reasonably relate[d] to the seriousness of this offense" and Hopkins' extensive "criminal history." The court then ordered Hopkins' life sentence served consecutively to his federal sentence.

Initially, we recognize that under Tennessee Rule of Criminal Procedure 32(c)(2)(B), a trial court "shall impose a sentence that is consecutive to any . . . unserved [federal] sentence unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders." Therefore, pursuant to this rule, Hopkins could not have received concurrent sentencing unless the trial court found that good cause existed to order the sentences served concurrently and explicitly so ordered, which did not occur in this case.

We also recognize that the trial court ordered Hopkins' felony murder sentence served consecutively to his federal sentence after finding that more than one of the criteria in Code section 40-35-115(b) existed. First, the trial court determined that Hopkins was a professional criminal who knowingly devoted his life to criminal acts as a major source of livelihood. See T.C.A. § 40-35-115(b)(1). The trial court noted that Hopkins' criminal history, which primarily consisted of property crimes, was "indicative of somebody who is engaging in criminal behavior for the purpose of sustaining livelihood or a major source of livelihood." The court found that Hopkins chose "not to try to be productive but to steal from other people," which was significant because the victim's murder in this case was committed in the perpetration of a robbery. The record shows that Hopkins, who was thirty-nine years old at the time of the conviction in this case, had worked just over six years of his adult life. Although Hopkins argues that there was no evidence he derived a major source of livelihood from his criminal acts, we conclude that his extensive criminal history of property crimes, along with his extremely limited employment history, support the trial court's finding regarding this factor.

The trial court also found that Hopkins had an extensive record of criminal activity in light of his "multiple" felony convictions. See id. § 40-35-115(b)(2). The trial court, while recognizing that "[p]roperty crimes don't weigh quite as heavy as violent crimes," found that "when you have this many, it is significant and sufficient to show that

[Hopkins] has [an] extensive [record of] criminal activity." Therefore, we conclude that the record also supports the trial court's finding as to this factor.

Finally, the trial court considered whether Hopkins was "a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." See id. § 40-35-115(b)(4). The court recognized that the dangerous offender classification was "more of a stretch," but noted that it "could possibly apply [here] as well."

In Wilkerson, 905 S.W.2d at 938, the Tennessee Supreme Court held that when imposing consecutive sentencing based on the dangerous offender classification, the trial court was required to make two additional findings, that the terms imposed were "reasonably related to the severity of the offenses committed" and were "necessary in order to protect the public from further criminal acts by the offender." We note that even if the trial court did not make this second additional finding required for the dangerous offender classification, the trial court properly determined that Hopkins was a "professional criminal" and that his "record of criminal activity [was] extensive." T.C.A. § 40-35-115(b)(1), (2). Because the trial court did not abuse its discretion in ordering consecutive sentencing, we affirm the sentence in this case.

## CONCLUSION

Based on the aforementioned authorities and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

- 14 -