IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 1, 2017

**STATE OF TENNESSEE v. MONTREKUS LAMON TILLER**

**Appeal from the Circuit Court for Hardeman County**
**No. 16-CR-30       J. Weber McCraw, Judge**

_____

**No. W2017-00093-CCA-R3-CD**

_____

Defendant, Montrekus Lamon Tiller, was convicted of aggravated assault. He received a sentence of six years' incarceration to be suspended after 350 days. On appeal, he argues that the evidence was insufficient to support his conviction. After review, we find that the evidence was sufficient to support his conviction. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Billy G. Burk, District Public Defender; Periann Houghton (on appeal), Assistant Public Defender; and George D. Norton, Jr. (at trial), Selmer, Tennessee, for the appellant, Montrekus Lamon Tiller.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; D. Michael Dunavant, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

A Hardeman County grand jury indicted Defendant with one count of aggravated assault. The following facts were adduced at trial.

On April 26, 2014, Troy Turner, the victim, drove to a BP gas station in Whiteville, Tennessee, with his friend, Jerron Warren, and the victim's son as passengers. Once at the gas station, the victim got out of the vehicle and began filling it with gas. Mr. Warren went inside the gas station to pay for the gas. During this time, Defendant, his two sons, and a man named "Jerome" approached the victim. The victim is married to the mother of Defendant's two sons, and it appears that one of Defendant's sons was the topic of a discussion between Defendant and the victim. After a brief exchange of words, Defendant punched the victim in the face.

Mr. Warren witnessed Defendant punch the victim, and Mr. Warren retrieved his Glock 17 pistol from the glove compartment of the car. According to Mr. Warren, he was unable to cock the pistol or point it at anyone before he received a strike to the temple and fought with one of the men who had approached the victim. During this tussle, Mr. Warren received a second strike to the temple and lost consciousness. Once Defendant emerged with possession of the Glock 17, Defendant returned to his truck, and the victim returned to the vehicle that he was filling with gas. As they left the gas station in their respective vehicles, the victim turned and headed west while Defendant turned and headed east. When their paths crossed, the victim claims Defendant had the gun in his hand, held the gun out the window of the vehicle, and fired a shot. Even though the shot did not hit the victim or his vehicle, he feared for both his life and the life of his child.

Upon regaining consciousness, Mr. Warren stood up and attempted to get away, but he was hit by a pick-up truck in the parking lot of the gas station. After getting hit by a truck and picking himself up from the ground for a second time, Mr. Warren heard a gunshot as he ran to safety. Eventually, he was able to run across the highway in front of the gas station and hide in the woods until the police arrived. While waiting in the woods, Mr. Warren heard a second gunshot.

Defendant gave inconsistent statements to police. Defendant's first statement depicted the events as resulting from a harshly worded conversation between Defendant and the victim. As that conversation progressed, the victim approached one of Defendant's sons with "his hand down like he was finna [sic] hit him." At this point, Defendant hit the victim. Subsequently, Defendant heard one of his sons say, "[D]on't shoot me." Then, Defendant fought Mr. Warren for possession of the Glock 17. As Defendant made his way back to his vehicle with the Glock 17, the victim "ran him over." Defendant told his sons to leave and "was finna [sic] kill him, but [Defendant] turned around and got in the car."

Defendant's two statements to the police, which were presented at trial, differ with regard to what happened when the Glock 17 was in his possession. In his first statement, Defendant states that he only heard the shot. In his second statement, Defendant recounts

that the gun was on the seat beside him in his vehicle. When he thought that the victim was going to run into him, he grabbed the gun, and "the gun went off after [Defendant] started turning." Then, at a later point, Defendant "started trying to figure out how to use the gun." He did not think that the gun was loaded because he moved the slide rearward and "did not see a bullet go in." However, he claimed "it went off again."

After Defendant left the BP gas station, he took his children to a friend's house and left the Glock 17 at that location. At some point in the night, Defendant returned to the BP gas station and spoke with the police.

The Whitesville Police Department conducted an investigation and found that there were no bullets lodged in the car, there were no bullet holes in the car, and the victim's body was not hit by a bullet. Lieutenant Ben Davis testified that if the events occurred in the way that they were described by the victim, then it is likely that a bullet would have hit the victim or the car driven by the victim. The police also found no bullet holes in the Defendant's vehicle, but the windows were down on Defendant's vehicle at the time that it was inspected. During the investigation, police discovered video cameras at the BP gas station. However, on April 26, 2014, the police were unable to retrieve the video footage because the clerk at the gas station did not have access to the footage. Because the BP gas station was undergoing a change in ownership, the police never retrieved the video footage.

A considerable amount of testimony was devoted to whether Defendant could have accidently fired the Glock 17. A good portion of that testimony can be adequately distilled to one line from the testimony of Special Agent Kasia Lynch with the firearms identification unit of the Tennessee Bureau of Investigation. With regard to the Glock 17 pistol involved in this case, she said, "Nothing can make this gun fire if the trigger is not being pulled to the rear." Lieutenant Davis also testified that he had not witnessed an accidental discharge of a Glock firearm where the trigger had not been pulled. However, neither Special Agent Lynch nor Lieutenant Davis could rule out the possibility that the trigger could have been accidentally pulled by Defendant.

The jury convicted Defendant as charged of aggravated assault. Defendant filed a motion for a new trial and a judgment of acquittal. The trial court denied Defendant's motion, and this timely appeal followed.

*Analysis*

On appeal, Defendant argues that the evidence is insufficient to support his conviction for aggravated assault because "[t]he record is replete with inconsistent testimony" and "[i]n light of the many inconsistencies, justice requires a trier of fact to utilize a videotape that would have without bias or prejudice shown the true facts leading

up to the shooting[.]" The State disagrees and argues that the evidence is sufficient to support Defendant's conviction. Further, the State argues that it had no duty to acquire the videotape footage and that the videotape footage is irrelevant to determining the sufficiency of the evidence supporting Defendant's conviction. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Tennessee Code Annotated section 39-13-101(a) sets forth the criminal offense of assault as follows:

A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowing causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

An aggravated assault is committed when a defendant intentionally or knowingly commits an assault that involved the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii).

Without specifically mentioning an inconsistency, Defendant argues that Mr. Warren's testimony is inconsistent with Mr. Warren's written statement, the victim's statement, and Defendant's written statements. Further, Defendant argues that the victim's testimony was inconsistent with Defendant's written statements. Inconsistencies in the testimony are to be resolved by the jury. *Wagner*, 382 S.W.3d at 297. When the jury in this case issued a guilty verdict, the jury accredited the testimony of the State's witnesses, the victim and Mr. Warren, and any conflict or inconsistency in the testimony of Mr. Warren or the victim was resolved in favor the prosecution's theory. "Innumerable cases" have stated that this Court is not free to re-evaluate evidence as it pleases. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). Thus, we decline to re-evaluate the testimony in this case after the jury has accredited the testimony of the State's witnesses.

Next, we turn to the question of whether the evidence was sufficient to support a conviction for aggravated assault with the inconsistencies resolved in favor of the State. The victim testified that Defendant had the gun in his hand, held the gun out the window of the vehicle, and fired a shot. As a result, the victim feared for his life. Mr. Warren corroborated this testimony when he testified that his gun had been taken from him and that he heard a shot fired. Based on the testimony of the victim alone, a reasonable juror could find beyond a reasonable doubt that Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury by the use or display of a deadly weapon. *See* T.C.A. § 39-13-101(a)(2), -102(a)(1)(iii).

Defendant argues that justice required the jury to rely on a videotape in order to avoid the bias and inconsistencies in testimony and have a foundation for determining the truth. Our rules of evidence provide the means for establishing the proper foundation for determine the truth; it is called impeachment. *See* Tenn. R. Evid. 607. Defendant, via counsel, was free to obtain the videotape and introduce it as evidence at trial, but he declined to do so. Further, Defendant had the many avenues of impeachment set forth by Article VI of the Tennessee Rules of Evidence available to challenge the veracity of the State's witnesses' testimony. Having found the evidence sufficient to support a conviction for aggravated assault, we refuse to entertain the argument that a specific piece of evidence was required for the evidence to be sufficient.

Defendant also argues that the evidence is insufficient as plain error because a clear and unequivocal rule of law was breached when the State failed to preserve exculpatory evidence pursuant to *State v. Ferguson*, 2 S.W.3d, 912 (Tenn. 1999). We refuse to allow Defendant to use a sufficiency of the evidence challenge to backdoor a

preservation of exculpatory evidence issue into the courtroom, especially after Defendant failed to put this issue in his motion for a new trial. Even if we conducted a plain error review, Defendant's argument is meritless because the State must first obtain the evidence before the State has a duty to preserve it. *See State v. Yevette Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at \*4 (Tenn. Crim. App. Feb. 11, 2002) (citing *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)), *no perm. app. filed.* In this case, there is no indication that the State ever possessed the videotape from the BP gas station.

## *Conclusion*

For the foregoing reasons, we affirm the judgment of the trial court.


_____
TIMOTHY L. EASTER, JUDGE